<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JERRY RAY CRAINE,

      Defendant - Appellant.

No. 19-6189

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:19-CR-00012-F-1)**
_____

Submitted on the briefs:[*]

Kyle E. Wackenheim, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

Timothy J. Downing, United States Attorney, and Julia E. Barry, Assistant United States Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.
_____

Before **McHUGH**, **KELLY**, and **EID**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

     [*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Defendant-Appellant Jerry Ray Craine pleaded guilty to one count of possessing a firearm after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). The charge arose out of Mr. Craine's possession and use of a firearm to shoot and kill his father, Thomas Craine.[1] The district court applied a cross-reference to first-degree murder when calculating Mr. Craine's advisory Guidelines range under the U.S. Sentencing Guidelines. Applying this cross-reference resulted in a "flat" Guidelines range of 120 months' imprisonment, the statutory maximum as provided in 18 U.S.C. § 924(a)(2). The court imposed 120 months' imprisonment.

Mr. Craine challenges his conviction on one ground and his sentence on two grounds. He argues his conviction should be vacated because the district court erred in denying his motion to withdraw his guilty plea after the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). There, the Court held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Id*. at 2200. Mr. Craine argued that, under *Rehaif*, the government was required to prove he knew he was prohibited from possessing a firearm as a result of his domestic violence conviction, and he argued the government could not do so because he lacked such

_____

[1] We refer to Mr. Craine's father as "Thomas" or as "Mr. Craine's father" in this opinion, to avoid confusion with the defendant-appellant.

knowledge. The district court disagreed that *Rehaif* imposed such a requirement and accordingly denied Mr. Craine's withdrawal motion.

Regarding his sentence, Mr. Craine raises both a procedural and a substantive challenge. He argues the district court committed procedural error by applying the cross-reference for first-degree murder when calculating his Guidelines range. Specifically, he contends the district court should not have applied any cross-reference because he acted in self-defense. Alternatively, he claims the district court should have applied the cross-reference for involuntary manslaughter, because he acted in imperfect self-defense.

Mr. Craine also argues his 120-month sentence is substantively unreasonable. Specifically, he asserts that in imposing the statutory maximum, the district court failed to adequately take into account various mitigating facts that weigh in favor of a shorter sentence.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm. First, we reject Mr. Craine's challenge to his conviction because it is predicated entirely on an interpretation of *Rehaif* that is foreclosed by our recent decision in *United States v. Benton*, 988 F.3d 1231 (10th Cir. 2021). Second, we reject Mr. Craine's procedural challenge to his sentence. The district court did not clearly err in finding Mr. Craine acted with malice aforethought and not to protect himself or others when he shot and killed his father. In light of these factual findings, the court did not err in applying first-degree murder as the most analogous cross-reference. Finally, we reject Mr. Craine's challenge to the substantive reasonableness

3

of his sentence because he fails to rebut the presumption of reasonableness that attends his within-Guidelines sentence.

## I.  BACKGROUND

### A.  Factual History

We first summarize the facts related to the shooting at the center of this appeal; we then summarize additional facts relevant to Mr. Craine's sentence. We derive these facts from the U.S. Probation Office's Presentence Investigation Report, ROA, Vol. 2 at 1–42 ("PSR"); from the district court's findings at Mr. Craine's sentencing; and from an audio recording of Mr. Craine's transport to jail following the shooting.[2] Except as indicated, these facts are undisputed on appeal.

### 1.  The Shooting

In the period before and during the shooting, Mr. Craine lived with his father, Thomas, in Perkins, Oklahoma. Mr. Craine had taken Thomas in because Thomas was homeless. Thomas was "seriously and dangerously mentally . . . unstable" and "was prone to engaging in threatening behavior in stressful situations." ROA, Vol. 3 at 21. Thomas's mental instability was well-known to his family members, including Mr. Craine. *See, e.g.*, *id.* at 21–22 (district court's finding that Thomas "was known to . . . his son, [Mr.] Craine," to be dangerously mentally unstable); PSR ¶ 59

---

[2] An audio recording of Mr. Craine's transport to the jail was submitted to the district court and is part of the record on appeal.

(Thomas's brother described him as a "very troubled man" who "was mentally ill and had been most of his life").

Mr. Craine and his wife, Fatima Craine,[3] were together running errands in a nearby town on the day of the shooting, July 29, 2018. While they were out, Ms. Craine's ten-year-old son, E.A.,[4] was playing at his friend A.S.'s house across the street from Mr. Craine's house. At some point during the day, E.A. went back to Mr. Craine's house and saw Thomas standing in the living room loading a gun. E.A. immediately ran back to A.S.'s residence where he informed A.S.'s mother, Stefanie Sreaves, about what he had seen. Ms. Sreaves and E.A. called Ms. Craine to alert her to the situation. Ms. Sreaves then instructed E.A. and A.S. to go to a room in the back of A.S.'s house, which is where they remained until police later arrived, following the shooting.

When Ms. Craine received the call from Ms. Sreaves, Mr. Craine immediately turned their van around to drive home. At some point during the day's events, A.S.'s father, Shane Sutton, told Mr. Craine that he had called the police and they were on their way.

Mr. and Ms. Craine arrived back at the house and parked their van on the street. Mr. Craine immediately walked to the front door and stepped inside. He saw his father standing near the kitchen with a pistol. Mr. Craine tried to tell his father to

---

[3] Mr. Craine and Ms. Craine were separated at the time of the shooting. Ms. Craine initiated divorce proceedings in 2019.

[4] E.A. was Mr. Craine's stepson during the relevant time period.

put the gun down, but Thomas threatened to shoot Mr. Craine if he entered the house any further. PSR ¶ 15 (Mr. Craine reported Thomas threatened to shoot him); *id.* ¶ 31 (Mr. Sutton reported hearing Mr. Craine say "put the gu—" before screaming and exiting the house); *accord* ¶ 44 (Mr. Craine's statement that he told his father "multiple times, to please put the gun down"). At that point, Mr. Sutton told Ms. Craine to run into his and Ms. Sreaves's residence, which she did.

After shutting the door, Mr. Craine retreated to his other vehicle, which was parked in the driveway and which the district court found was a "position of relative safety." ROA, Vol. 3 at 40. Mr. Craine had a firearm and two magazines stored there. He loaded one magazine into the firearm and placed the other in his pocket. Mr. Craine then left his vehicle and went back to the front door of the house, carrying his firearm. When Mr. Craine opened the door this second time, he yelled "dad" and "put the gun down" a couple of times, at which point his father began to fire. *Id.* ¶ 32. At least one of Thomas's shots hit the grass in the front yard. Mr. Craine and his father exchanged gunfire, and Mr. Craine emptied his magazine. Mr. Craine then retreated to the front porch, where he reloaded his firearm with the second magazine. After reloading, he stepped back into the residence. His father again shot at him, and the father and son exchanged additional gunfire. Although Mr. Craine could not see his father, he heard him "bleeding, coughing, and gurgling." *Id.* ¶ 45. He knew his father had been shot.

The police arrived minutes later. They encountered Mr. Craine in the front yard. Officers heard Mr. Craine stating "I shot at him. It's self-defense. He shot at me." *Id.* ¶ 11. Mr. Craine was handcuffed and taken to the Payne County Jail.

Officers entered the house and found Thomas deceased on the floor. An autopsy revealed he had been shot two times, once in the leg and once in the chest; his cause of death was the gunshot wound to his chest.

## 2. Mr. Craine's Transport to the Jail

During Mr. Craine's transport to the Payne County Jail, he "was emotional and sobbing uncontrollably." *Id.* ¶ 12. He expressed shock and sadness that his "own dad" had tried to shoot him. Audio Recording at 4:15–22. He stated he told his father to put the gun down "several times," Audio Recording at 14:30–36, and that he "was just trying to protect [his] family." *Id.* at 13:11–20. He also stated he believed his father was still alive when the police arrived and was distressed the officers would not allow him to go inside so he could try to help him. *Id.* at 7:26–7:46 ("I could've helped him, man. They wouldn't let me go in and help him. I knew he was alive when the cops got there [because] . . . I could hear him in there. I just needed to go . . . help him. I had a . . . trauma kit. I could have went and stopped the bleeding. But they didn't let me go in there. I could've . . . helped him, man. I could've helped him."). He also repeatedly stated, while sobbing, "I didn't wanna hurt my own dad." *Id.* at 7:47–8:10.

Mr. Craine also expressed concern about the consequences of the day's events for himself, stating "I don't want to be in trouble. My whole life is going to be

7

ruined. My whole life is going to be ruined over that [expletive]." *Id.* at 4:26–4:36. And he expressed worry that his domestic violence history would be used against him in court. *Id.* at 5:52–5:59 ("They're gonna say I got a history of [expletive] violence."); *see also id.* at 12:28–38 (expressing concern he would be sent to prison).

### 3.  Mr. Craine's Mental State

The parties dispute Mr. Craine's state of mind during the period immediately leading up to and during the shooting. They are in agreement that, at the time Mr. Craine first decided to return home and enter his residence, his intent was not to kill his father; and they agree he did not form such an intent when he retreated to his vehicle. *See* ROA, Vol. 3 at 30 (Mr. Craine's counsel: "it's clear that Mr. Craine went to the door in an attempt to de-escalate the situation"); *id.* at 37 (prosecutor: "[Mr. Craine's counsel] mentioned to the [c]ourt[ that] when Mr. Craine went to the car, he didn't intend to kill his father. Well, fine, I'm not arguing that he did."). But they disagree as to his mental state when he decided to exit his vehicle and return to his house, armed with a firearm and two magazines of ammunition. And they dispute his mental state when, after emptying his first magazine, he retreated to the porch, reloaded, and reentered the house, ultimately firing the shot that killed his father.

The district court agreed with the government that Mr. Craine possessed malice aforethought when he fired the fatal shot, and that he was not acting to protect himself or others.

> As I read the presentence report, . . . each time [Mr. Craine] went out to the car, I found myself saying, please, go down the street, go across the

8

street. He didn't do it. That is, in my view, one of the most pivotal facts of this case. . . .

When I say that I so fervently wished that he had gone down the street, across the street, when he saw his father with the gun, . . . I tried my very best to reach that judgment and pass judgment on those facts from the perspective of this defendant, Jerry Ray Craine, who found himself in that situation on that terrible day.

I judge the defendant's thought process on the basis of the circumstances he was dealing with in real time. . . .

I conclude -- and this is . . . not a happy conclusion, . . . that this was not a de-escalation attempt. . . . [T]here were two or three iterations of the conduct, returning to the home, armed and prepared to shoot, and obviously inclined to shoot, that really eliminate the suggestion that that was a de-escalation attempt; it was not.

. . .

I find . . . that [Mr. Craine possessed] . . . malice aforethought; that we did not have a de-escalation situation, we did not have a self-defense situation.

ROA, Vol. 3 at 42–43, 63.

### 4. Additional Relevant Facts

*a. Domestic violence misdemeanor convictions*

Mr. Craine has two prior misdemeanor convictions, both of which are described in some detail in the PSR and were considered by the district court at sentencing.

Mr. Craine's first conviction stemmed from a 2001 offense against his father, when Mr. Craine was 18 years old. In that incident, Thomas reported Mr. Craine had tackled him to the ground and attempted to hit him with a chair. Thomas was able to get away and then attempted to call the police, but Mr. Craine tackled him again, breaking the phone. Thomas flagged down an officer near an intersection. The officer

9

observed red areas on Thomas's arms, and noted that he "appeared emotionally shaken up." PSR ¶ 86.

When an officer went to Mr. Craine's bedroom to apprehend him, he was standing against a wall with his fists clenched. The officer advised Mr. Craine that he was under arrest for domestic assault and instructed him to turn around and place his hands behind his back. Mr. Craine responded by yelling obscenities at the officer and stating, "come and get me" and "come on over here and get some." *Id.* Mr. Craine then told his father that he was going to beat him up "for calling the 'pigs' on him." *Id.* The officer sprayed Mr. Craine in the face with pepper spray, at which point Mr. Craine "turned away and began to growl and yell more obscenities towards the officer." *Id.* Mr. Craine ultimately complied with the officer's instructions and was transported to jail.

Mr. Craine was convicted of a second domestic violence offense in 2017, when he was 35 years old. In this incident, Ms. Craine advised officers that Mr. Craine hit her in the face approximately three times and flipped over a bench while she was sitting on it, in front of her two children. The officers noted she had a scrape on her right elbow with fresh blood, her lower lip appeared to be swollen, she had an injury on her left hand, and her pinky finger was bleeding. When asked about the incident, Mr. Craine admitted that he had "dumped" Ms. Craine off a bench "and broke her phone," but he asserted he had acted in self-defense, after Ms. Craine hit him. *Id.* ¶ 87. As he was placed under arrest and during his transport to jail, Mr. Craine made numerous threats toward law enforcement. *See id.* (stating police officers "were being

10

ambushed and that it could happen in Perkins too" and stating he "was part of a mafia" and "court would be had in the [expletive] streets").

As a condition of probation for his second domestic violence conviction, the court ordered Mr. Craine to complete a batterers' course. In a letter submitted to the district court, the course's program coordinator noted that "Mr. Craine's continued minimization of the domestic violence, as well as [Mr.] Craine's justification of his use of violence as 'self-defense[,]' is an[] area of perceived concern due to the appearance that he lacks accountability for his actions." *Id.*

Mr. Craine admits he knew he was a domestic-violence misdemeanant at the time he possessed a firearm. He states he was unaware, however, that as a result of his convictions, he was prohibited from possessing a firearm.

### b. *County jail misconduct*

During Mr. Craine's detention at the Payne County jail before sentencing on this offense, he was involved in multiple altercations. In one incident, Mr. Craine responded to a correctional officer's instructions by stating "[y]ou can fix your face problem" and hurling obscenities at her. *Id.* ¶ 10. Later, when Mr. Craine was handcuffed and taken to a disciplinary pod, he "assaulted a male officer by shoving his left shoulder into the officer's chest, forcing the officer against a wall," and then "continu[ing] to throw his weight around[,] attempting to knock down the officer." *Id.*

In a separate incident, Mr. Craine "was observed punching another inmate in a medical cell." *Id.* ¶ 10b. "When correctional officers responded, and instructed

11

[Mr. Craine] to face the door, he charged at them and pushed the correctional officers against a wall." *Id.* Officers were eventually able to handcuff Mr. Craine and to place him in a restraint chair for approximately two hours. When they first removed him from the chair, Mr. Craine "tried to elbow an officer in the face." *Id.* He also "made a statement 'that by the end of the day, everyone in the jail will be dead.'" *Id.*

### c. *Mitigating facts*

Mr. Craine's father was abusive when Mr. Craine was growing up—toward Mr. Craine, Mr. Craine's brother, and Mr. Craine's mother. Thomas became more violent as he got older. In addition to suffering from mental illness, Thomas was a habitual drug user and an alcoholic. Mr. Craine struggles with mental health issues, as well.

Mr. Craine is also a father. His only biological child, a daughter, was four years old at the time of the shooting. Ms. Craine described Mr. Craine as a "loving father" and stated "he had a good bond with their daughter." PSR ¶ 103. At sentencing, Mr. Craine expressed concern about missing out on being a father to his daughter during his incarceration.

### B. *Procedural History*

## 1. Pre-Sentencing Proceedings

In January 2019, a federal grand jury in the Western District of Oklahoma charged Mr. Craine with a single count of possession of a firearm by a person who "ha[s] been previously convicted of a misdemeanor crime of domestic violence," in

12

violation of 18 U.S.C. § 922(g)(9). The penalty for this offense is found in 18 U.S.C. § 924(a)(2). Mr. Craine pleaded guilty without a plea agreement in March of 2019.

Three months later, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). Mr. Craine moved to withdraw his guilty plea, arguing that in light of *Rehaif*, the government was required to prove, as an additional element of the charged offense, that he knew his domestic violence conviction made it illegal for him to possess a firearm.

The district court denied Mr. Craine's motion. It rejected his interpretation of *Rehaif* as requiring the government to prove he knew his domestic violence conviction made it illegal for him to possess a firearm. Rather, the court held *Rehaif* requires the government prove only that Mr. Craine knew he "possessed a firearm" and knew he "ha[d] been convicted in any court of a misdemeanor crime of domestic violence" at the time of possession. ROA, Vol. 1 at 58 (first quoting *Rehaif*, 139 S. Ct. at 2194, then quoting 18 U.S.C. § 922(g)(9)). The court noted Mr. Craine had admitted, through counsel, his knowledge of these facts. And it held a supplemental plea hearing "to ensure that [Mr. Craine] agrees with th[ose] representations made by counsel." *Id.* at 61; W.D. Okla., 5:19-cr-00012-F-1, Docket Entry 43. Mr. Craine's case proceeded to sentencing.

## 2. Sentencing Proceedings

### a. *Selection of cross-reference*

The Sentencing Guidelines direct district courts to apply "the most analogous offense Guideline from [USSG §2A1] (Homicide)" if the defendant used a firearm in

13

his offense of conviction in connection with the commission of another offense, and death resulted. USSG §2K2.1(c)(1)(B). Mr. Craine argued no cross-reference should apply, asserting he had acted in self-defense and therefore had not used the firearm in connection with the commission of another offense. In the alternative, he argued the correct cross-reference should be to involuntary manslaughter, under the theory that he had acted in imperfect self-defense. The government argued the appropriate cross-reference should be first-degree murder, asserting Mr. Craine had acted unlawfully and with malice aforethought when he shot and killed his father.

The district court agreed with the government and applied the first-degree murder cross-reference under USSG §2A1.1. This cross-reference, combined with a criminal history category of II, resulted in a base offense level of 43, from which the district court subtracted three levels for Mr. Craine's acceptance of responsibility. Absent a statutory maximum, Mr. Craine's advisory Guidelines range would have been 342 to 405 months' imprisonment. However, Mr. Craine's conviction carried a statutory maximum of 120 months' imprisonment. Accordingly, the bottom of what would have been the advisory Guidelines range (342 months) was in excess of the statutory maximum, resulting in what the district court described as a "flat" Guideline of 120 months' imprisonment. ROA, Vol. 3 at 45.

b. *Consideration of the 3553(a) factors & imposition of sentence*

The district court imposed a Guidelines sentence of 120 months' incarceration. In explaining its reasoning for this sentence, the court first acknowledged that Mr. Craine "in many ways, was tolerant of his father in an extraordinarily difficult

14

situation," "[t]ook his father in when he had no place to live," and endured his father "in situations which would have tested anyone." *Id.* at 61. The court also "recognize[d] that, beyond any doubt, . . . [Mr. Craine] devoutly desires to be a good father to his daughter." *Id.*; *see also id.* at 65 (acknowledging Mr. Craine's "unquestionable desire to be a good father and to care for his little girl"). The court went on:

> I have before me in some ways two different Jerry Ray Craines. I have the Jerry Ray Craine who loved and still loves his daughter, who loved and still loves his father, who with malice aforethought decided to end his father's life.
>
> I have before me the Jerry Ray Craine who threatened to kill everybody in the jail on September 5th of this year, who remained physically and verbally belligerent in his interactions with jail personnel . . . [in] several instances. . . .
>
> I have before me an individual who has shown his belligerent impulsiveness, his tendency to be brutal and violent and out of control.
>
> I have before me a defendant who committed the offenses of domestic abuse in 2001 and 2017. I have before me a defendant who has no compunction about inflicting physical harm on a vulnerable person. That's the other Jerry Ray Craine that I have before me.

*Id.* at 61–62.

The court then discussed the § 3553(a) factors. It considered the nature and circumstances of Mr. Craine's offense to be "extraordinarily serious," in light of its earlier finding that Mr. Craine had acted with malice aforethought when shooting his father. *Id.* at 63. It further stated Mr. Craine's case "was not a plain-vanilla case of a possession of a firearm by a person convicted of . . . the misdemeanor crime of domestic violence." *Id.* The court explained the need for the sentence imposed to

15

reflect the seriousness of the crime was informed by these same considerations. *Id.* at 64.

The district court also considered Mr. Craine's history and characteristics, "not the least of which is the fact, on one hand, that [Mr. Craine] has been capable of leading a productive constructive life, but apparently his erratic and impulsive conduct has fairly well precluded that." *Id.* at 63. The court further commented that the incidents while Mr. Craine was in jail "reflect decidedly negatively on [his] history and characteristics." *Id.* at 63–64.

The court described the need for incapacitation as "a very significant factor":

> I have before me an individual who, in 2001, committed a serious offense of domestic abuse. I'd like to think that would have been the last of it, but he did it again in September of 2017, domestic assault and battery in the presence of minor children, and that was the infliction of injury on a vulnerable person. That is telling. That makes a difference.
>
> . . . [T]hose are the facts, together with the defendant's behavior while detained, together with the offense conduct itself, which lead me to the conclusion that, for purposes of considering incapacitation as a factor, I do have before me a brutal, impulsive, violent person who can lose control and does lose control, has lost control.

*Id.* at 64–65.

The court stated "[g]eneral deterrence would probably be satisfied by a significantly lighter sentence." *Id.* at 64. Finally, it stated it did not consider the remaining § 3553(a) factors—the need to promote respect for the law, considerations of just punishment, and specific deterrence—particularly relevant under the circumstances of Mr. Craine's case.

\* \* \*

16

Mr. Craine appealed his conviction and sentence.

## II. DISCUSSION

### A. Withdrawal of Guilty Plea

Mr. Craine asserts his conviction must be vacated because the district court erred in denying his motion to withdraw his guilty plea. We disagree.

### 1. Legal and Procedural Background

Mr. Craine was convicted of possessing a firearm after having been previously convicted of a misdemeanor crime of domestic violence, under 18 U.S.C. §§ 922(g)(9) and 924(a)(2). Section 922(g) makes it unlawful for certain individuals to "possess in or affecting commerce, any firearm or ammunition." The provision lists nine categories of individuals subject to the prohibition, the ninth of which is "any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence." § 922(g)(9). A separate provision, § 924(a)(2), adds that anyone who "knowingly violates" § 922(g) shall be fined or imprisoned for up to 10 years.

When Mr. Craine pleaded guilty to violating § 922(g)(9) in March of 2019, the Tenth Circuit had "expressly held that the only knowledge required for a § 922(g) conviction is knowledge that the instrument possessed is a firearm." *United States v. Games-Perez*, 667 F.3d 1136, 1140 (2012) (internal quotation marks omitted). In June of 2019, the Supreme Court decided *Rehaif v. United States*, where it held that "in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." 139

17

S. Ct. at 2200. That is, *Rehaif* held the mens rea requirement of knowledge applies not just to the defendant's knowledge that he possessed a firearm, but to the defendant's knowledge that he holds a status identified by § 922(g), as well.

Mr. Craine moved to withdraw his guilty plea. He argued that under *Rehaif*, the government was required to prove he knew that his prior misdemeanor conviction of domestic violence prohibited him from possessing a firearm—something Mr. Craine asserted he did not know. The district court denied Mr. Craine's motion, reasoning, *inter alia*, that "*Rehaif* does not require the government to prove that [Mr. Craine] knew he was prohibited from possessing a firearm." ROA, Vol. 1 at 58. Rather, the government need prove only that Mr. Craine knew of his firearm possession and "knew of his relevant status—convicted in any court of a misdemeanor crime of domestic violence." *Id.* at 59. The district court noted that Mr. Craine had admitted, through counsel, his knowledge of both elements, and it held a supplemental plea hearing to ensure Mr. Craine "agree[d] with the[se] representations made by counsel." *Id.* at 61. Accordingly, the court held Mr. Craine had failed to satisfy his burden of showing a "fair and just reason" for withdrawing his plea and denied his motion. *See United States v. Sanchez-Leon*, 764 F.3d 1248, 1258 (10th Cir. 2014) ("A defendant may withdraw a plea of guilty before sentencing if he 'can show a fair and just reason for requesting the withdrawal.'" (quoting Fed. R. Crim. P. 11(d)(2)(B)).

## 2. Standard of Review

We review the district court's denial of Mr. Craine's motion to withdraw for an abuse of discretion; we review factual findings for clear error and legal conclusions de novo. *Id.* at 1259.

## 3. Analysis

Mr. Craine argues the district court erred in denying his motion because it misinterpreted the elements necessary for his offense of conviction, as set forth in *Rehaif*. Thus, the issue on appeal is whether, in light of *Rehaif*, the government was merely required to prove Mr. Craine knew he possessed a firearm and knew he had previously been convicted of a domestic violence offense, as the district court held, or whether the government was required to further prove Mr. Craine "knew his misdemeanor conviction for domestic violence made it unlawful for him to possess a firearm," as Mr. Craine contends. Aplt. Br. at 25. The proper interpretation of *Rehaif* is a legal question we review de novo.

Our analysis here is straightforward, as we recently rejected the precise interpretation of *Rehaif* Mr. Craine advances. Specifically, in *United States v. Benton*, we held "the government *need not prove* a defendant knew his status under § 922(g) prohibited him from possessing a firearm" to secure a conviction under §§ 922(g) and 924(a)(2). 988 F.3d at 1232 (emphasis added). Rather, as the district court properly concluded in Mr. Craine's case, "the only knowledge required for conviction is that the defendant knew he (1) possessed a firearm and (2) had the relevant status under § 922(g) at the time of his possession." *Id.* (footnote omitted). We accordingly reject

19

Mr. Craine's challenge to his conviction, as it is predicated solely on an interpretation of *Rehaif* that is foreclosed by our binding precedent.

### B. Cross-Reference to First-Degree Murder

Mr. Craine's second challenge on appeal is to the district court's application of the first-degree murder cross-reference when calculating his Guidelines range. We reject Mr. Craine's assertion that the district court's application of this cross-reference constituted procedural error. Specifically, we hold the district court did not clearly err in finding that, when he fatally shot his father, Mr. Craine possessed malice aforethought and did not believe his deadly force was necessary to protect himself or others. Thus, we agree with the district court's selection of first-degree murder as the most appropriate cross-reference.

### 1. Legal and Procedural Background

When calculating the Guidelines range for a defendant who (1) "used . . . any firearm . . . cited in the offense of conviction in connection with [(2)] the commission or attempted commission of another offense," district courts must apply "the most analogous" federal homicide Guideline, "if death resulted." USSG §2K2.1(c)(1)(B).[5]

---

[5] In full, U.S. Sentencing Guideline §2K2.1(c)(1)(B) provides:

(c) Cross Reference

(1) If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply—

For purposes of this provision, "another offense" includes "any federal, state, or local offense . . . regardless of whether a criminal charge was brought, or a conviction obtained." USSG §2K2.1 application note 14(C). Cross-references must be supported by a preponderance of the evidence. *United States v. Craig*, 808 F.3d 1249, 1255, 1259 (10th Cir. 2015). "[A] perfect match is not required between the defendant's conduct and the homicide guideline selected as the most analogous." *United States v. Cherry*, 572 F.3d 829, 831 (10th Cir. 2009) (quotation marks omitted).

Applying this framework, the questions before the district court when deciding which cross-reference to apply were:

(1) Did Mr. Craine's offense of conviction involve a firearm?

(2) If so, did he use or possess this firearm or ammunition in connection with the commission or attempted commission of another federal, state, or local offense, regardless of whether he was charged or convicted of such other offense?

(3) If the answer to the above two questions is yes, and if death resulted, what is the most analogous homicide Guideline, under the U.S. Sentencing Guidelines?

The answer to the first question was of course a simple "yes." Mr. Craine pleaded guilty to possessing a firearm after having been convicted of a misdemeanor crime of domestic violence, under 18 U.S.C. § 922(g)(9). His offense of conviction therefore involved a firearm.

---

. . .

(B) if death resulted, the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above.

The district court also answered the second question in the affirmative, concluding Mr. Craine used the firearm in connection with the commission of a state-law offense—first-degree murder under Oklahoma state law. Mr. Craine disputes this conclusion, arguing that he acted in defense of himself and others and that he did not otherwise possess the mens rea necessary for first-degree murder.

Finally, the district court concluded the most analogous federal Guideline, under the third inquiry above, was the first-degree murder Guideline found in USSG §2A1.1. Mr. Craine disputes this conclusion as well, asserting the district court should have applied no cross-reference to homicide because he acted in perfect self-defense. In the alternative, he argues the court should have applied the cross-reference to involuntary manslaughter found in USSG §2A1.4, because he acted in imperfect self-defense.

We now turn to the standards of review applicable to the district court's conclusions outlined above, an issue the parties vigorously dispute, before turning to the merits of Mr. Craine's procedural challenge.

## 2. Standards of Review

This court reviews "legal questions regarding the application of the Sentencing Guidelines de novo, and a district court's factual findings . . . for clear error." *United States v. Finnesy*, 953 F.3d 675, 688 (10th Cir. 2020) (quotation marks omitted); *see also United States v. Wooten*, 696 F. App'x 337, 339 (10th Cir. 2017) (unpublished) ("We review the district court's selection of the most analogous offense guideline with due deference, limiting our review of its factual findings for clear error but

conducting de novo review over its interpretations of the guidelines and the ultimate determination of which of several offense guidelines most appropriately applies to the facts as found.").

The parties recite the standards above, but they disagree as to how these standards should apply in Mr. Craine's case. Mr. Craine argues "the correct standard of review is de novo because the question for the district court was the correct guideline application in light of the undisputed and stipulated facts." Aplt. Reply at 3. For its part, the government seems to argue we must review the district court's selection of the first-degree murder cross-refence exclusively under the clear-error standard. *See, e.g.*, Aple. Br. at 18–19 (arguing "[t]he district court did not clearly err when it . . . found that the first-degree murder Guideline most accurately described Mr. Craine's actions").

Both parties are partly correct. The district court's decision to apply the first-degree murder cross-reference comprised two steps. First, the district court was required to make findings as to disputed issues of fact. Although many of the facts before the district court were "undisputed and stipulated," as Mr. Craine notes, *see* Aplt. Reply at 3, the parties vehemently debated Mr. Craine's mental state at the moment he used deadly force against his father. We review the district court's factual findings concerning Mr. Craine's mental state for clear error. Second, the district court was required to decide which Guideline (if any) most appropriately applies, under the undisputed facts and the additional facts as found by the district court. We review this legal conclusion de novo.

Mr. Craine advances several arguments in support of his contention that this court's review should be entirely de novo. His arguments are ultimately unavailing.

First, he argues that "[b]ecause the facts [before the district court] were not in dispute, the district court's decision was one of law, namely whether Mr. Craine's actions arose to first degree murder." Aplt. Reply at 4. He notes the district court was presented with the PSR that contained a detailed statement of facts to which neither party objected.

Although Mr. Craine is correct the parties neither disputed the facts contained in the PSR nor Mr. Craine's conduct on the day in question, he overlooks the material facts that were disputed before the district court. Most critically, the parties disputed Mr. Craine's mental state when he fatally shot his father, and there was evidence that could support conflicting factual inferences in this regard. Thus, the district court was required to make factual findings concerning Mr. Craine's mental state during the relevant time period, and it found that Mr. Craine acted with malice aforethought and not with the belief his use of deadly force was necessary to protect himself or others.[6]

---

[6] Neither party appears to dispute that findings concerning an individual's mental state are factual findings, and indeed, this proposition is well settled. As the Supreme Court has explained:

> The law often obliges finders of fact to inquire into a person's state of mind. As Lord Justice Bowen said in treating this problem in an action for misrepresentation nearly a century ago: "The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else."
> *Eddington v. Fitzmaurice*, 29 Ch. Div. 459, 483 (1885).

Mr. Craine next argues that the sole case cited by the government in favor of applying a clear-error standard of review—this court's unpublished decision in *Wooten*—is distinguishable because there, "two live witnesses" were called to testify at the sentencing hearing. Aplt. Reply at 3–4. Accordingly, Mr. Craine contends clear-error review was warranted in *Wooten* because "[t]he district court was charged with the traditional task of making determinations of fact based on evidence presented in [c]ourt." *Id.* at 4. Here, conversely, neither party called witnesses or otherwise presented any evidence at the sentencing hearing, which Mr. Craine claims eliminates the justification for clear-error deference on review.

Mr. Craine's attempt to distinguish *Wooten* is inaccurate as a matter of fact and is misguided as a matter of law. First, although Mr. Craine correctly notes that neither he nor the government called any witnesses to testify at the sentencing hearing, he is incorrect that neither party submitted any evidence. Indeed, Mr. Craine submitted the audio recording of his transport to jail, and the district court acknowledged it had considered this evidence at sentencing. *See* ROA, Vol. 3 at 18 ("I should . . . make it clear also that I have listened to the recording made during the transport of the defendant."). Both parties argued that Mr. Craine's recorded

---

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716–17 (1983); *see also Miller v. Fenton*, 474 U.S. 104, 113 (1985) ("[T]hat an issue involves an inquiry into state of mind is not at all inconsistent with treating it as a question of fact."). This court has similarly stated that "[t]he issue as to a person's state of mind almost invariably presents an issue of fact." *Wertheim & Co. v. Codding Embryological Scis., Inc.*, 620 F.2d 764, 766 (10th Cir. 1980); *see also United States v. Wooten*, 696 F. App'x 337, 340 (10th Cir. 2017) (unpublished) ("Because the district court did not clearly err in finding the requisite mental state . . . .").

statements shed light on his state of mind during the shooting. *See* ROA, Vol. 3 at 33 (Mr. Craine's counsel: "[W]hen we're talking about malice aforethought, what is Mr. Craine's reaction when the police arrive? . . . [H]e's hysterical. 'I have a trauma kit, I can save my father, let me in there.'"); *id.* at 37 (prosecutor: "I listened to that recording and I heard a man who was really sorry he got caught. . . . In fact, I believe Mr. Craine opines that he's now going to be in trouble because of that expletive . . . his father, whom he has now killed.").

But even if no evidence had been submitted at sentencing, Mr. Craine's argument fails on the law. This court must apply the clearly erroneous standard to factual findings "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence *or inferences from other facts*." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (emphasis added). Thus, even if the district court's factual findings as to Mr. Craine's mental state were based exclusively on inferences from other, undisputed facts in the record—rather than based on the district court's assessment of witness testimony or physical or documentary evidence—they are entitled to deference under the clear-error standard. *See id.* at 574–75 (listing the various reasons appellate courts must generally review factual findings for clear error, and stating "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility").

\* \* \*

26

In analyzing whether the district court committed procedural error when it selected the first-degree murder Guideline, we review the district court's factual findings for clear error, and we review its selection of the most appropriate cross-reference based on the facts de novo.

### 3. Analysis

With the above standards of review in mind, we now turn to whether the district court committed procedural error. We conclude it did not.

#### a. Legal standards

Recall that the first disputed question before the district court was whether Mr. Craine used the firearm "in connection with the commission or attempted commission of another federal, state, or local offense." USSG §2K2.1(c)(1). The district court concluded Mr. Craine used his firearm in connection with the commission of first-degree murder as defined under Oklahoma state law. It then concluded the first-degree murder Guideline, found in USSG §2A1.1, was the most analogous cross-reference.

Oklahoma defines first-degree murder as causing the death of another person "unlawfully and with malice aforethought." Okla. Stat. Ann. tit. 21, § 701.7(A). "Malice," in turn, "is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." *Id.* The federal, first-degree murder Guideline similarly provides that it "applies in cases of premeditated killing." USSG §2A1.1 app. note 1. This court has explained that a sentencing court may "permissibly select section 2A1.1 as the most analogous

guideline" where "evidence presented at . . . an evidentiary hearing demonstrates by a preponderance of the evidence that the defendant harbored malice aforethought and premeditation" when committing the deadly offense. *United States v. Fortier*, 180 F.3d 1217, 1226 (10th Cir. 1999).

Under Oklahoma law, a "[h]omicide is . . . justifiable"—that is, it is not unlawful—when it is committed in perfect self-defense, defined as "the lawful defense of such person or of another, when the person using force reasonably believes such force is necessary to prevent death or great bodily harm to himself or herself or another or to terminate or prevent the commission of a forcible felony."[7] Okla. Stat. Ann. tit. 21, § 733(A)(2). To invoke self-defense, the danger of death or serious bodily injury must be imminent. *See Mammano v. State*, 333 P.2d 602, 605 (Okla. Crim. App. 1958).

A defendant acts in "imperfect self-defense" if the factfinder concludes the defendant was "criminally negligent" in his "belief that deadly force was necessary to prevent death or great bodily harm." *United States v. Toledo*, 739 F.3d 562, 569 (10th Cir. 2014). If a defendant acts in imperfect self-defense, he is guilty of involuntary manslaughter, rather than murder. *Id.*[8] The federal Guideline applicable to involuntary manslaughter is found in USSG §2A1.4.

---

[7] A "forcible felony" is defined in this context as "any felony which involves the use or threat of physical force of violence against any person." Okla. Stat. Ann. tit. 21, § 733(B).

[8] Mr. Craine states that Oklahoma "does not recognize a defense of imperfect self-defense," but he asserts we can nonetheless look to federal law to determine

The critical difference "between perfect and imperfect self-defense [is] the reasonableness of the defendant's belief that deadly force was necessary to prevent death or great bodily harm—if reasonable, then he is entitled to a self-defense acquittal; if criminally negligent, then he is guilty of involuntary manslaughter." *Toledo*, 739 F.3d at 569 (footnote omitted). Thus, in both the perfect and imperfect self-defense contexts, the defendant must possess the subjective belief that deadly force was necessary to prevent death or great bodily harm, but only in the perfect self-defense context must the defendant's subjective belief also be objectively reasonable.[9]

b. *Analysis*

The district court found, by a preponderance of the evidence, that Mr. Craine committed first-degree murder as defined under Oklahoma state law. *See* ROA, Vol. 3 at 40 ("Th[e] facts add up, in my view, to the offense defined in 21 O[kl. Ann.] S[tat.] [tit.] § 701.7."). It reached this conclusion because it found Mr. Craine possessed malice aforethought when he fatally shot his father, and further found Mr. Craine did not believe his use of deadly force was necessary to protect himself or

---

whether Mr. Craine acted in imperfect self-defense and, therefore, whether the cross-reference to involuntary manslaughter provides the most analogous federal Guideline. The government likewise cites federal law on imperfect self-defense. We follow the parties' lead.

[9] We note that Mr. Craine does not argue the district court erred in selecting the first-degree murder cross-reference in lieu of the second-degree murder cross-reference, as the most analogous Guideline. We therefore do not consider whether such a cross-reference would have been more appropriate, under the circumstances of this case.

others. *See id.* at 63 ("I find . . . that [Mr. Craine possessed] . . . malice aforethought; that we did not have a de-escalation situation, we did not have a self-defense situation."). The parties do not dispute Mr. Craine fired the shot that killed his father. What is disputed is the district court's findings that he did so with malice aforethought and not with the belief he was acting to protect himself or others.[10] Accordingly, the first step in determining whether the district court erred in applying the first-degree murder cross-reference is to review its findings concerning Mr. Craine's mental state. As discussed above, we review these findings for clear error.

"A finding of fact is clearly erroneous only if it is without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made." *United States v. Maestas*, 642 F.3d 1315, 1319 (10th Cir. 2011) (quotation marks omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573–74. Thus, "[w]here there are two permissible views of the

_____

[10] As indicated, the subjective belief that one's use of deadly force is necessary to protect oneself or others is a necessary component of both perfect and imperfect self-defense. Accordingly, the district court's finding that Mr. Craine lacked this subjective belief is sufficient to negate the applicability of both defenses. Because we hold this factual finding as to Mr. Craine's mental state was not clearly erroneous, *see infra*, we need not separately analyze whether Mr. Craine's subjective belief would have been objectively reasonable.

evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574; *see also see United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995) ("To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge.").

The district court's findings—that Mr. Craine killed his father with malice aforethought and did not believe his use of deadly force was necessary to protect himself or others—have support in the record. Most significantly, these inferences concerning Mr. Craine's mental state may be supported by the fact that Mr. Craine twice decided to return to his house, armed and prepared to shoot, notwithstanding that he knew he was entering a dangerous situation and had other, safer options available to him. First, after his father threatened to shoot him, Mr. Craine retreated to his vehicle in the driveway. Mr. Craine does not dispute the district court's finding that his vehicle was a "position of relative safety." ROA, Vol. 3 at 40. "From that position of relative safety," the district court observed, "[Mr. Craine] could have gone in any direction, 360 degrees." *Id.* But instead of "go[ing] down the street, [or] across the street," *id.* at 42, or waiting for the police to arrive, "[t]he direction [Mr. Craine] chose to go in was back to the danger," *id.* at 40, armed with a firearm and two magazines. After Mr. Craine emptied his first magazine, he was able to retreat to the front porch. But again, instead of retreating further, Mr. Craine reloaded his firearm and once more returned to the danger.

31

Certain statements Mr. Craine made in interviews with law enforcement following the shooting lend additional support to the district court's findings concerning his mental state. For example, Mr. Craine expressed that his "main concern" was that he would get "in big trouble" if his father shot a police officer with his (Mr. Craine's) firearm, PSR ¶¶ 41, 43, suggesting his conduct during the relevant period was premeditated and driven by a fear of getting in trouble, rather than by a belief that he needed to use deadly force to protect himself and others from serious, imminent harm. Multiple statements Mr. Craine made during his transport to jail further substantiate this view. *See* Audio Recording at 4:26–4:36 ("I don't want to be in trouble. My whole life is going to be ruined. My whole life is going to be ruined over that [expletive, referring to his father]."); *id.* at 5:52–6:03 ("They're gonna say I got a history of . . . violence. I'm gonna be f—d for life, man."); *id.* at 12:28–38 ("I'm gonna be so f—d. I'm on probation. I'm gonna . . . go to prison.").

To be sure, the district court's interpretation of the evidence is not the only permissible one. There is evidence in the record that could support a finding that Mr. Craine did not act with malice aforethought and instead believed his use of deadly force was necessary to protect himself or others. But the district court's findings as to Mr. Craine's mental state are "plausible in light of the record viewed in its entirety," and therefore, we "may not reverse" those findings, regardless of how we might have weighed the evidence in the first instance. *Anderson*, 470 U.S. at 573–74.

We next review de novo the district court's conclusion that first-degree murder was the most analogous federal homicide Guideline considering the undisputed facts

before it and the additional facts as found. Because the district court did not clearly err in finding that Mr. Craine possessed malice aforethought when he fatally shot his father and that he did not believe his use of deadly force was necessary to protect himself or others, we hold the district court properly determined the most analogous Guideline was the first-degree murder Guideline found in USSG §2A1.1. *See Fortier*, 180 F.3d at 1226 (stating a sentencing court may "permissibly select section 2A1.1 as the most analogous guideline" where "evidence presented at . . . an evidentiary hearing demonstrates by a preponderance of the evidence that the defendant harbored malice aforethought and premeditation"); *Wooten*, 696 F. App'x at 340 ("Because the district court did not clearly err in finding the requisite mental state, we agree that the most appropriate guideline is attempted first-degree murder."). We accordingly reject Mr. Craine's procedural challenge to his sentence.[11]

### C. Substantive Reasonableness

Mr. Craine's final challenge on appeal is that his 120-month sentence was substantively unreasonable. We reject this challenge, as well, and accordingly affirm the district court's sentence.

---

[11] Because we would hold the district court did not err in applying the first-degree murder cross-reference, we need not address the government's argument that, if the district court had so erred, the error was harmless. We likewise need not reach the government's argument that Mr. Craine waived his imperfect self-defense arguments due to inadequate briefing.

### 1. Legal Standards and Standard of Review

"We review the reasonableness of a sentence for abuse of discretion." *United States v. Miller*, 978 F.3d 746, 753 (10th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "Substantive reasonableness addresses whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." *Id.* (quotation marks omitted).

The § 3553(a) factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant . . . ;

(5) any pertinent policy statement . . . ;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

"In conducting our substantive reasonableness review, we will reverse only if the sentence imposed was arbitrary, capricious, whimsical, or manifestly unreasonable." *Miller*, 978 F.3d at 754 (internal quotation marks omitted). Although we must "take into account the totality of the circumstances," *Gall*, 552 U.S. at 51, "[w]e may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo." *United States v. Smart*, 518 F.3d 800, 808 (10th Cir. 2008). "Such deference is accorded because '[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.'" *Miller*, 978 F.3d at 754 (alterations in original) (quoting *Gall*, 552 U.S. at 51). Finally, if a sentence "is within the properly calculated [G]uideline[s] range," we presume it is reasonable. *Id.* (alterations in original) (quotation marks omitted). The defendant bears the burden of rebutting this presumption. *Id.*

## 2. Analysis

Because we reject Mr. Craine's procedural-error challenge, *see* Part II.B *supra*, the district court properly calculated his Guidelines range as a "flat" Guideline of 120-months' imprisonment.[12] As such, the 120-month sentence the district court imposed was

---

[12] The district court used the term "flat [G]uideline" because the bottom of what would have otherwise been Mr. Craine's advisory Guidelines range (342 months' imprisonment) was higher than the statutory maximum for his offense (120 months' imprisonment). ROA, Vol. 3 at 45. Thus, his advisory Guidelines 'range' was simply the statutory maximum—120 months' imprisonment.

a within-Guidelines sentence, and Mr. Craine bears the burden of rebutting the presumption that this sentence was reasonable. He fails to do so.

Mr. Craine advances four principal arguments in support of his substantive reasonableness challenge. Specifically, he argues his 120-month sentence is unreasonably long because: (1) the State of Oklahoma decided to charge him with voluntary manslaughter, not first-degree murder; (2) he believed his possession of the firearm was lawful; (3) he "felt immediate, deep remorse for the death of his father"; and (4) he "did not intend to kill his father, as that term is commonly understood." Aplt. Br. at 21–22. Regarding the last point, he asserts he "did not fire first"; he "sought to de-escalate the situation" and to persuade his father to disarm; and "[i]n his mind, there was an imminent threat," prompting him to feel "a responsibility to protect others and help." *Id.* at 22. We consider each argument in turn.

First, Mr. Craine contends "[i]t is particularly noteworthy that the State of Oklahoma decided to charge [him] with voluntary manslaughter." *Id.* at 22. Mr. Craine, however, fails to explain why a state prosecutor's charging decision should dictate the district court's sentencing decision. Nor does he explain why it should bear on this court's review of the substantive reasonableness of the district court's decision. As the government correctly notes, "the manner in which a state actor exercises his prosecutorial discretion is . . . simply not a factor that Congress has instructed federal judges to consider." Aple. Br. at 23 (citing 18 U.S.C. § 3553(a)).

36

Mr. Craine's latter three arguments center around the first 3553(a) factor—the nature and circumstances of his offense. But Mr. Craine fails to demonstrate that the district court abused its discretion in concluding this particular factor weighed in favor of the substantial prison sentence it imposed, let alone rebut the presumption that his within-Guidelines sentence was reasonable "given all the circumstances of the case in light of [all of the relevant] factors set forth in 18 U.S.C. § 3553(a)." *Miller*, 978 F.3d at 753.

As to the nature and circumstances of the offense, the district court aptly observed that this "was not a plain-vanilla case of possession of a firearm by a person convicted of . . . the misdemeanor crime of domestic violence." ROA, Vol. 3 at 63. Rather, it was a firearm-possession offense that resulted in another person's death. Thus, notwithstanding the existence of several mitigating facts,[13] the district court's conclusion that, overall, this factor supported imposition of a 120-month, within-Guidelines sentence was not arbitrary, capricious, or manifestly unreasonable.

When Mr. Craine's arguments are considered in the context of the § 3553(a) factors as a whole, it becomes even clearer that he cannot rebut the presumption of reasonableness afforded his within-Guidelines sentence. For example, the need for the sentence imposed to reflect the seriousness of Mr. Craine's crime strongly supports the reasonableness of his sentence, particularly where the district court found he acted with

---

[13] Although Mr. Craine points to certain mitigating facts relevant to the nature and circumstances of his offense that are undisputed—such as that Mr. Craine did not fire first and told his father to put his gun down—other "facts" he marshals in support of his argument were directly rejected by the district court. In particular, the district court rejected Mr. Craine's factual assertions that he was acting in defense of himself and others and was attempting to "de-escalate the situation."

malice aforethought. The district court also appropriately observed that the need for incapacitation is a "very significant factor" in Mr. Craine's case, given his long history of violent conduct that began in 2001 and continued up to and even after his instant offense. ROA, Vol. 3 at 64–65. This violent conduct includes Mr. Craine's assault and battery on his wife in 2017, which the court observed was inflicted "on a vulnerable person" and "in the presence of minor children." *Id.* Relatedly, Mr. Craine's continued violent conduct while detained—including assaults on both prisoners and guards—"reflect[s] decidedly negatively" on his history and characteristics. *Id.* at 63. Under these circumstances, we cannot conclude the district court's selection of a 120-month prison sentence was "arbitrary, capricious, whimsical, or manifestly unreasonable," *Miller*, 978 F.3d at 754 (internal quotation marks omitted).

For these reasons, we hold Mr. Craine's 120-month, within-Guidelines sentence is substantively reasonable in light of the factors set forth in 18 U.S.C. § 3553(a) as applied to the present facts. We therefore affirm.

### III. CONCLUSION

We **AFFIRM** Mr. Craine's conviction under 18 U.S.C. § 922(g) because the district court did not err in denying his motion to withdraw his guilty plea, and we **AFFIRM** Mr. Craine's 120-month, within-Guidelines sentence as procedurally and substantively reasonable.