**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 7, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DHANZASIKAM R. TOLEDO,

    Defendant - Appellant.

No. 13-2027

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 1:11-CR-03075-BB-1)**

---

Marc H. Robert, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant - Appellant.

Niki Tapia-Brito, (Kenneth J. Gonzales, United States Attorney, and James R.W. Braun, Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

---

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

    Defendant–Appellant Dhanzasikam R. Toledo appeals from his conviction

of voluntary manslaughter. 18 U.S.C. §§ 1112, 1153. Although the district court

instructed the jury on second degree murder and voluntary manslaughter, it denied

Mr. Toledo's request for self-defense and involuntary manslaughter instructions.

Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse and remand for a

new trial.

Background

Mr. Toledo is an enrolled member of the Navajo Nation. In November

2011, he lived with his mother, Irma Sanders, who is Navajo, and his step-father,

Hershel Sanders, who is African-American. Mr. Toledo's biological father is also

African-American. The Sanders and Mr. Toledo resided on a large parcel of land

in Ramah, New Mexico, within the borders of the Navajo Nation. On the same

parcel of land (about 125 yards away) lived Arvin Toledo and his family.[1] A

barbed-wire fence separated the two families' plots.

The two families had lived in relative harmony, but money, alcohol, and

racism had strained their relations. 3 R. 94-96, 116, 366-68. Ms. Sanders and

Mr. Toledo, both devout in their Navajo beliefs, noticed odd things happening to

them and their land. Id. at 370-72. They held the belief that "skinwalkers"[2]

---

[1] We follow the parties' practice of referring to Defendant–Appellant Dhanzasikam Toledo as "Mr. Toledo" and Arvin Toledo as "Arvin." Arvin is Ms. Sanders's brother and Mr. Toledo's uncle.

[2] See The Oxford English Dictionary (3d ed. 2009) (defining "skinwalker," as the term is used "in Navajo folklore," as "a malevolent person with supernatural powers who assumes the appearance of a wolf, coyote, or other

would come onto and around their land.  Id. at 255, 371.  Mr. Toledo believed that his uncle, Arvin, was versed in the "skinwalker way."  Id. at 369.

Before November 10, 2011, Arvin had visited the Sanders' house three times to ask Mr. Toledo to pay a debt.  Id. at 96-97.  Arvin left each time empty handed.  Around 9:00 p.m. on November 10, 2011, Ms. Sanders told Mr. Sanders and Mr. Toledo that she had "a real bad feeling" and sensed a problem going on outside.  Id. at 103, 384.  She told Mr. Toledo "to go out with [Mr. Sanders] and put ashes on the horses, the animals and the property."  Id. at 384.  Mr. Toledo had been instructed to do this by a medicine woman as a ward against skinwalkers.  Id. at 371-72.

After Mr. Sanders and Mr. Toledo finished spreading the sacramental ashes, Mr. Sanders heard Arvin calling his name.  Id. at 110-11.  The two met at the fence separating their land.  Id. at 112.  Arvin told Mr. Sanders that Mr. Sanders needed to "chain his dog," id., and it became clear that Arvin was referring to Mr. Toledo, id. at 114-15.  Mr. Sanders told Arvin that the "name calling" needed to stop, id. at 116, as Arvin had made derogatory references to Mr. Sanders and Mr. Toledo's race and skin color several times in the past, id. at 118, 367, 370.  At that point, Mr. Toledo came and stood next to his step-father at the fence.  Id. at 117.  Mr. Toledo confronted Arvin about money that Arvin allegedly took from Ms. Sanders.  Id. at 118.  Arvin then began directing racial

animal by wearing its skin").

- 3 -

slurs at both the Sanders and Mr. Toledo. Id. Mr. Sanders turned to walk away, hoping that Mr. Toledo would follow. Id. at 119. Arvin too began to walk away. Id. at 120. However, when Mr. Toledo said, "And another thing, stop calling us names," Arvin spun around and reapproached the fence yelling, "nigger, nigger, nigger." Id. at 120, 147. As Mr. Sanders recalled, Arvin did this "almost [running]" toward the fence and came "nose tip to nose tip" with Mr. Toledo. Id. at 123, 121. Mr. Sanders perceived Mr. Toledo to say "I'm not afraid of you" and knock Arvin to the ground. Id. at 123-24. In reality, Mr. Toledo had stabbed Arvin, fatally.

At trial, Mr. Toledo testified that he had no intention of killing his uncle and that his only intent in the moment of the stabbing was to defend himself. Id. at 403, 404, 409. At the time of his death, Arvin stood about six feet and weighed 263 pounds. Id. at 341, 339. Mr. Toledo stood only five feet seven inches and weighed 160 pounds. Id. at 181. Mr. Toledo testified that, when Arvin reapproached the fence, Arvin "had his hands up." Id. at 400. When asked what he feared in that moment, Mr. Toledo responded, "That [Arvin] was going to grab me or choke me or just—he could have easily pulled me over the fence. I was light as a feather." Id. at 404.

Arvin was known to be a heavy drinker. Id. at 149, 365-68. Before the stabbing, Mr. Sanders was close enough to smell alcohol on Arvin's breath, id. at 114, and at the time of his death, Arvin's blood alcohol content was 0.123, id. at

- 4 -

316. Mr. Toledo had not been drinking. Id. Mr. Sanders testified that it was difficult to generalize Arvin's demeanor "because at one minute it was pleasant, and the next minute it could be a raging bull." Id. at 113. Mr. Sanders testified that Arvin "could become very violent" when he drank. Id. at 149.

In addition to Arvin's physique and temperament, Mr. Toledo testified that he had a very real appreciation—and fear—of his uncle's supernatural abilities. According to Mr. Toledo, he was aware that Arvin "was a Satanist," id. at 368, and would notice "witchcraft activity" whenever he was around, id. at 369. Mr. Toledo believed that Arvin had "tried to harm [him] with the witchcraft" in the past and that this posed an additional danger in the moment his uncle "lunged at" him. Id. at 405, 452.

Mr. Toledo recognized that a fence separated him from his uncle and that he could have simply "backed away." Id. at 403. The fence was 41.5 inches high and made up of five strands of barbed wire.[3] Id. at 218-19. After the slaying, FBI Agent John Fortunato examined the fence. He testified that the barbed wire at the site "seemed tight," and when he "tried to climb over to see how much give it would have," he was unable to do so at that point.[4] Id. at 219. Mr. Sanders, in

---

[3] In his brief, Mr. Toledo characterized the fence as three-stranded; however, counsel corrected this misapprehension at oral argument. Oral Argument at 02:45–02:50, United States v. Toledo, No. 13-2027 (10th Cir. Nov. 19, 2013).

[4] Agent Fortunato also testified that he was unable to climb through the wires at that point. 3 R. 222. He further testified that other officers were able to

contrast, thought the fence posed a less substantial barrier: "I want to make one point clear—that fence is like a rubber band. Arvin weighs what, 210, 220. And if he's against the fence . . . he would have been able to reach over to [Mr. Toledo]." Id. at 123.

Mr. Toledo also recognized he was not entirely defenseless against his uncle. Concealed in his left sleeve, Mr. Toledo carried a twelve inch marine combat knife strapped to his inner arm. Id. at 236, 435. It had been a gift some years back from his step-father, Mr. Sanders, id. at 444, and Mr. Toledo carried the knife with him at all times, id. at 439. In fact, constant wear had molded the knife's sheath to the crook of Mr. Toledo's elbow. Id. at 436. Through self-training, Mr. Toledo had mastered the technique of "unbuckl[ing] [the knife] in the process of pulling it out." Id. at 436, 439. It was through this rapid movement, which Mr. Toledo called a "natural reaction," id. at 441, that he "blocked [Arvin's] hands and then . . . stabbed him," id. at 437. Mr. Toledo had also studied martial arts. Id. at 438-39.

A federal grand jury indicted Mr. Toledo for second degree murder. 18 U.S.C. §§ 1111, 1153; 1 R. 15. Prior to trial, Mr. Toledo offered proposed jury instructions, including instructions on self-defense and the lesser included offenses of voluntary manslaughter and involuntary manslaughter. Id. at 21-25.

---

get around the fence at a different point, although he could not recall whether they climbed through or over the fence. Id. at 222-23.

After the close of evidence, the district court indicated its skepticism as to whether the evidence supported the defense's theories of self-defense and involuntary manslaughter. 3 R. 467, 471. The matter was close, and the court struggled with "second thoughts about [a] self-defense" instruction. Id. at 473. However, after thinking about it overnight, the court decided not to instruct the jury on either self-defense or involuntary manslaughter. Id. at 491. The court reasoned that, "other than what [Mr. Toledo] testified to in the courtroom," no evidence showed that he was in fear of serious bodily injury or death. Id. at 484. According to the court, no reasonable threat existed given Mr. Toledo's alternatives, notwithstanding counsel's argument that Mr. Toledo was confronted with a much larger person reaching across the fence and lunging at him on a dark winter night. Id. at 467-68. The court instructed the jury on only second degree murder and voluntary manslaughter. 1 R. 79-82. The jury acquitted Mr. Toledo of second degree murder and convicted him of voluntary manslaughter. Id. at 88. The court then sentenced Mr. Toledo to 76 months' imprisonment followed by a three-year term of supervised release. Id. at 91-92.

## Discussion

Mr. Toledo requested jury instructions on the recognized defense of self-defense and the lesser included offense of involuntary manslaughter. 1 R. 21, 24-

25. On appeal, he argues that the district court erred in finding the evidence insufficient to warrant either of these instructions. We take each instruction in turn.

A.   Self-Defense

We review the district court's decision to give a particular jury instruction for abuse of discretion; however, we review the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law. United States v. Platte, 401 F.3d 1176, 1183 (10th Cir. 2005). Specifically, a defendant is entitled to an instruction on any recognized defense for which there is evidence sufficient for a reasonable jury to find in his favor. United States v. Harris, 695 F.3d 1125, 1136 (10th Cir. 2012). For the purposes of determining the sufficiency of the evidence, we accept the testimony most favorable to the defendant. Id.

A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response. See United States v. Visinaiz, 428 F.3d 1300, 1311 (10th Cir. 2005); United States v. Gresher, 802 F.2d 373, 384 (10th Cir. 1986); cf. 10th Cir. Crim. Pattern Jury Instructions No. 1.28 (2011). By his own account, on that dark winter night, Mr. Toledo feared that Arvin would grab or choke him when Arvin rushed at him with raised hands. 3 R. 400, 404. Mr. Toledo consistently testified that he feared his uncle and his actions were solely intended to defend himself.

Id. at 403, 409, 439, 456. If Mr. Toledo's testimony was credited, the jury could reasonably have concluded that Mr. Toledo believed that deadly force was necessary to prevent Arvin from causing him great bodily harm.

The district court did not give any weight to this testimony, concluding that "other than" Mr. Toledo's testimony that he was afraid, no evidence supported a self-defense instruction. Id. at 483-91. But when deciding whether the evidence supports a particular jury instruction, a court "must give full credence to [the] defendant's testimony." United States v. Benally, 146 F.3d 1232, 1236 n.4 (10th Cir. 1998) (quoting United States v. Smith, 63 F.3d 956, 965 (10th Cir. 1995)). Ultimately, the jury may or may not believe the testimony; but it must be both credited and considered as evidence bearing on the issue of self-defense.

Furthermore, it was not just Mr. Toledo's testimony that bore on the issue of self-defense. If credited, Mr. Sanders's testimony that Arvin could be very violent when drinking could lead a jury to reasonably conclude that Arvin exhibited great violence in the moment he approached Mr. Toledo and that Mr. Toledo's resort to deadly force was justified. This, along with Mr. Toledo's testimony, provides evidentiary support for a self-defense instruction.

Of course, the five-strand barbed-wire fence may be a problem for the defense on retrial. By Mr. Toledo's own admission, he could have retreated rather than defend himself at the fence line. 3 R. 403. Considering this, a reasonable jury could certainly conclude that Mr. Toledo's resort to deadly force

was unreasonable and therefore reject a self-defense acquittal. It is possible, however, that Mr. Toledo's admission that he could have retreated occurred to him only in hindsight, and that in the heat of the moment, he genuinely thought that deadly force was necessary. As noted, Mr. Toledo testified that his first instinct when confronted with Arvin's aggression was to defend himself, that he was scared, and that when the stabbing occurred, he didn't believe he did it. 3 R. 404. He testified that Arvin could have easily pulled him over the fence. Id. Under these circumstances, a reasonable jury could conclude that Mr. Toledo had an objectively reasonable belief that deadly force was necessary.

Self-defense only requires the defendant's reasonable belief that deadly force was necessary, not that he exercise a duty to retreat or recognize the unavailability of reasonable alternatives. See Visinaiz, 428 F.3d at 1311; Gresher, 802 F.2d at 384; cf. 10th Cir. Crim. Pattern Jury Instructions No. 1.28 (2011). Additionally, Mr. Sanders testified that the fence was "like a rubber band" and might not have allowed for Mr. Toledo's sure retreat. 3 R. 123. And while this testimony was contradicted by Agent Fortunato, id., at 219, factual contradictions are the essence of trial. Stated another way, though a defendant's testimony may be contradicted to some degree by other evidence or even by his prior statements, a defendant is entitled to an instruction if the evidence viewed in his favor could support the defense. See United States v. Brown, 287 F.3d 965, 976-77 (10th Cir. 2002); see also United States v. Scout, 112 F.3d 955, 960 (8th

Cir. 1997). Likewise, Mr. Toledo's testimony that he feared his uncle—although contradicted by his at-the-scene statement, "I'm not afraid of you," 3 R. 484-85—should be taken into account when deciding the propriety of a certain jury instruction. See Brown, 287 F.3d at 976-77.

We appreciate that the district court recognized the self-defense issue to be a close call. 3 R. 473, 491. But the testimony of the defendant must be considered. The burden of production to warrant a self-defense instruction is "not onerous," and Mr. Toledo met that burden, notwithstanding that the evidence may be contradictory and not overwhelming. See Scout, 112 F.3d at 960. Having the benefit of time and a full record, we respectfully conclude that the evidence warrants a self-defense instruction so the jury may resolve the underlying factual questions.

B.    Involuntary Manslaughter

We review for abuse of discretion a trial court's decision whether to instruct on a lesser included offense; however, that discretion is not broad ranging "but is focused narrowly on whether there is any evidence fairly tending to bear on the lesser included offense." Brown, 287 F.3d at 974 (quoting United States v. Humphrey, 208 F.3d 1190, 1206 (10th Cir. 2000)). In fact, we have cautioned that a "trial court may properly deny a defendant's request for a lesser included offense instruction only when there is *no evidence* to reasonably support that conviction." Gilson v. Sirmons, 520 F.3d 1196, 1254 (10th Cir. 2008).

- 11 -

To secure a lesser included offense instruction, a defendant must satisfy four criteria. Brown, 287 F.3d at 974.

> First, the defendant must make a proper request; second, the lesser included offense must contain some but not all of the elements of the charged offense; third, the elements differentiating the two offenses must be in dispute; and fourth, the evidence must allow the jury to rationally acquit the defendant on the greater charge and convict on the lesser charge.

Id. The parties narrow their dispute to the fourth criterion, whether the evidence supported an instruction on the lesser included offense of involuntary manslaughter. Aplt. Br. 14; Aplee. Br. 15.

Involuntary manslaughter is a lesser included offense of second degree murder, the crime with which Mr. Toledo was charged. See Brown, 287 F.3d at 974. When a self-defense acquittal is not viable, a jury may nonetheless convict a defendant of "involuntary manslaughter if he acts in self-defense but is criminally negligent in doing so." Id. at 975. This is often called "imperfect self-defense." Id. at 977 n.6.

As the district court recognized, the analysis of involuntary manslaughter is inextricably intertwined with the self-defense analysis. 3 R. 470. Therefore, much of the discussion above applies. We perceive the distinguishing factor between perfect and imperfect self-defense to be the reasonableness of the defendant's belief that deadly force was necessary to prevent death or great bodily harm—if reasonable, then he is entitled to a self-defense acquittal; if

- 12 -

criminally negligent,[5] then he is guilty of involuntary manslaughter.

As we have indicated, a reasonable jury could conclude that Mr. Toledo's actions were a reasonable response to the threat he perceived from Arvin. Given that, the evidence also could support another conclusion—that Mr. Toledo's actions, though taken in self-defense, were less than reasonable and amounted to criminal negligence. This is true even if the "evidence is weak and contradicted." Brown, 287 F.3d at 975. A properly instructed jury may decide. The district court erred in denying an involuntary manslaughter instruction.

REVERSED and REMANDED for a new trial.

---

[5] See Brown, 287 F.3d at 975. The defendant's acts must amount to "gross negligence," defined as "wanton or reckless disregard for human life." United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000) (internal quotations omitted); cf. 10th Cir. Crim. Pattern Jury Instructions 2.54.1 (2011).