**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 25, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 23-7041

WILLIAM CLAYTON BROWN,

    Defendant - Appellant.
_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:20-CR-00109-DCJ-1)**
_____

Shira Kieval, Assistant Federal Public Defender, Denver, Colorado, (Virginia L. Grady, Federal Public Defender, with her on the briefs), for Defendant-Appellant.

Lisa C. Williams, Special Assistant United States Attorney, Muskogee, Oklahoma (Christopher J. Wilson, United States Attorney, with her on the brief), for Plaintiff-Appellee.
_____

Before **HOLMES**, Chief Judge, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

**BALDOCK**, Circuit Judge.
_____

Defendant William Clayton Brown, while under the influence of methamphetamine, busted into a locked bathroom and stabbed his friend, Damion Martin, in the back of his skull. Martin was embracing Defendant's sister, Lacie

Watson, who was naked except for a shower curtain she had wrapped around her body. Defendant was unaware Martin and Watson had a prior intimate relationship. What Defendant did know, however, was that Watson had just yelled at Martin to "get the fuck out" of the bathroom. Seconds later, Defendant entered the bathroom and stabbed Martin twice, killing him. When Watson asked why he stabbed Martin, Defendant exclaimed, "He was going to kill you, Lacie." After the stabbing, Defendant told three other people Martin had threatened to rape Watson.

The Government tried Defendant on one count of First-Degree Murder in Indian Country, in violation of 18 U.S.C. §§ 1111(a), 1151 and 1153. Defendant requested jury instructions on defense of another and the lesser-included offense of involuntary manslaughter. The district court refused to instruct the jury on defense of another, holding there was insufficient evidence Defendant's claim was objectively reasonable. But the court also omitted, without explanation, Defendant's requested involuntary manslaughter instruction raising the theory of *imperfect* defense of another. Defendant argues this omission was plainly erroneous. We agree. A defendant is entitled to a jury instruction on imperfect defense of another and the corresponding lesser-included offense of involuntary manslaughter if he tenders such an instruction and produces sufficient evidence that he subjectively believed deadly force was necessary to prevent death or great bodily harm to another, notwithstanding the fact that his belief was objectively unreasonable. Defendant met that standard here. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse Defendant's conviction and remand for a new trial.

2

**I.**

In September 2017, Defendant lived with his girlfriend, Leonda Gibson, at her home in Eufaula, Oklahoma.  Defendant's sister, Lacie Watson, was a close friend of Gibson's and lived with them full time.  At that time, Watson had an ongoing intimate relationship with Damion Martin.  Martin and Defendant were also friends.  Watson considered her relationship with Martin to be casual, so she did not disclose it to Defendant.

On September 15th, 2017, Defendant, Martin, Watson, and Gibson spent much of the day together.  Late that morning, Martin and Defendant picked up Watson and drove to a transmission shop to service Martin's vehicle.  Around noon, they left Martin's vehicle at the shop and called Gibson for a ride.  Gibson observed Defendant and Martin were acting "hyper."  They were "jumping around," talking a lot, and rapping back and forth.  Gibson drove Defendant, Martin, and Watson back to her house.  Defendant and Gibson got into an argument, and Gibson left shortly thereafter.  Watson remarked Defendant and Martin were "acting crazy," and continued singing and rapping at Gibson's house.

Later that afternoon, Defendant, Watson, and Martin went to Shawna Logan's house.  Alexis Perkins lived with Logan.  When Perkins arrived home around 4:30 p.m., she observed Defendant and Martin smoking marijuana together.  Defendant, Martin, and Logan left the house briefly to get food.  When they returned, Defendant and Martin smoked methamphetamine with Logan.  Defendant and Martin continued freestyle rapping at Logan's house.  At one point, Martin rapped, "I got yo' bitch.

3

She's gonna make me rich." Defendant "acted paranoid" and asked, "[w]ho?" At around 7:30 p.m., Defendant urged Martin to leave so they could return to Gibson's house.

Watson left Logan's house by herself to pick her daughter up from school. She returned home to Gibson's house that evening before Defendant and Martin. Watson was in the middle of cleaning the house when Defendant called and told her that he and Martin would be there in a minute. Watson, frustrated by their ongoing hyper behavior, responded "no." Watson explained, "they were just getting on [her] nerves" and she "didn't want to be around them because they were just too much." She then rushed to get in the shower with the intention of leaving the house before Defendant and Martin got there.

Defendant and Martin arrived before Watson had the chance to leave. They "busted" through the locked bathroom door while Watson was still showering. Defendant and Martin continued singing and rapping to Watson when they came in. One of the two placed Martin's pistol on the bathroom counter.[1] Watson abruptly told

---

[1] The record is inconclusive as to whether Defendant or Martin placed the pistol on the counter. Both men had a connection to the gun. Watson testified she saw Defendant holding the gun at some point when he was in the bathroom. She also testified she saw it "laying on the counter" but "d[id]n't know when it got there." It was the same pistol Martin had threatened Watson with a few days before his death. During that incident, Martin was having an apparent mental health crisis, and Watson drove to his location to check on him. When she arrived, Martin pointed the gun at her car until she talked him into putting it away. Watson did not tell Defendant about the incident and there was no evidence Defendant found out about it from another source. Watson saw Defendant carrying the pistol after Martin's death.

4

Defendant to "[g]et the hell out" of the bathroom because she was uncomfortable with her brother being there while she showered. Defendant complied and exited the bathroom. Watson instructed Martin to lock the door behind Defendant. After doing so, Martin sat down on the toilet and resumed rapping. Watson, annoyed by the rapping, told Martin, "Well, you can get the fuck out, too."[2] Martin responded, "Goddamn, Lacie," and sat back down on the toilet. Watson replied, "Well, go ahead and get out, then." Martin stood up to leave and asked, "can I get a hug?" Watson consented, wrapped the shower curtain around herself, and hugged Martin. Watson stood face-to-face with Martin with her eyes closed while they embraced.

While hugging Martin, Watson felt a "jolt," opened her eyes, and saw that Martin was unresponsive. Watson held on to Martin as they fell to the ground outside of the shower. She observed blood "everywhere" and a gash on Martin's side. Defendant was in the bathroom standing over them. Watson stated, "I can save him," and put pressure on the wound on Martin's side. Watson exclaimed to Defendant, "Why? Why?" Defendant responded, "He was going to kill you, Lacie." Watson replied, "No, the fuck he wasn't," and repeated, "I can save him." Defendant responded, "No you can't . . . I stabbed him in the brain." Watson held Martin until he stopped breathing and closed his eyes. Assistant Medical Examiner Doctor Cheryl Niblo later identified stab wounds to Martin's right upper back and right parietal skull.

---

[2] Watson testified that Gibson's house was "not too big" and she "was sure" someone standing outside the bathroom with the door closed could hear their conversation.

She concluded the second wound went through Martin's skull and into his brain, killing him. Martin had methamphetamine in his system at the time of his death.

Immediately after the attack, Defendant ordered Watson to put her clothes on and help clean up. Watson got dressed but refused to help. Defendant grabbed ahold of Watson and escorted her to the corner of the living room. The lights were off, and the room was dark. Watson was "still hysterical." Defendant instructed Watson to sit still and be silent. Defendant tossed her a bottle containing five or six pills, which she believed to be Gibson's Xanax prescription, and told her to take them. Watson did so. While Watson sat in the corner of the living room, Defendant cleaned up the bathroom. Watson saw him go back and forth between the hall bathroom and garage as he cleaned. Although she feared retaliation from Defendant, Watson managed to text Perkins the message "911" without Defendant seeing her.

Upon receiving Watson's text, Perkins went over to Gibson's house to check on Watson. She arrived to find the lights in the living room and hallway were off. Perkins knocked on the door two or three times and rang the doorbell. Eventually, Defendant emerged from the hall bathroom and talked to Perkins through the closed front door. After a brief exchange, Defendant told Perkins that Martin "left and was talking about going to rob somebody." Defendant could not explain who Martin left with or what method of transportation he took. Defendant was "pushy" and "short with his answers." Perkins left without going inside. Watson remained silent in the corner of the living room throughout the encounter.

6

The next morning, Defendant woke Watson up and told her to drive him to his mother's boyfriend, Mike Harris's house. Defendant had packed the backseat of Watson's car full of his belongings. Concealed beneath those items was a blue storage tote labeled "Christmas tree" that Defendant had removed from Gibson's garage. This was the same storage tote investigators discovered Martin's body in several days later. After they arrived at Harris's house, Defendant hid the storage tote in a metal shed behind the house. At that time, a friend of Harris's named George Turner lived in a camper parked in Harris' driveway. Turner went inside Harris's house later that night and conversed with Defendant and Harris. Turner testified Defendant "said something about somebody saying that they was [sic] going to rape his sister." He continued, "it was something to the effect that they wanted to rape his sister and suck on her titties." Turner could not recall who Defendant said made those threats. A few hours later, after midnight, Defendant knocked on Turner's camper door and said, "come check this out." Defendant guided Turner over to the shed in Harris's backyard. Once inside, Defendant pulled out the blue tote and opened the lid to reveal a partially decomposed body, later identified to be Damion Martin.

Gibson did not return home for several days after the stabbing. On one occasion, three days after the incident, Defendant asked Gibson to give him a ride to his grandparents' house. While they were in the car together, Defendant accused Gibson of working for the FBI and cut the cord to her vehicle's Bluetooth device because he thought it was recording their interaction. Gibson drove Defendant to her home but did not go inside. Two days later, Gibson drove home to pick up her things on the way

7

to school. When she arrived, Defendant was standing on the porch with a rag on top of his head. He told Gibson he was cleaning. Gibson once again drove off without going inside. When Gibson finally went inside her home, she noticed Defendant had rearranged the living room furniture, scattered her Christmas decorations across the garage, and removed the shower curtain from the hall bathroom. Gibson asked Defendant to leave her home. In the days following Martin's death, Defendant never told Gibson about the stabbing. Defendant did, however, tell Gibson that Martin "had threatened to rape Lacie."

As Gibson left to attend class, Watson called her and asked to meet. Gibson and Watson met in person and Watson told her about the stabbing. That night, Gibson and Watson went to the police station to file a report. After the meeting, police went to Gibson's house in an attempt to locate Defendant and Martin. Defendant was there upon the officers' arrival. They served Defendant with a trespass notice and transported him to Harris' house. Several days later, Harris called the police and reported finding a blue tote with a foul odor in the wooded lot across the street from his house. Officers discovered Martin's partially decomposed body inside the tote. Police subsequently searched Gibson's house and collected blood samples in the hall bathroom that were consistent with Damion Martin's DNA. Defendant was later taken into custody and indicted on one count of first-degree murder.

Defendant was housed in pretrial custody at the McIntosh County jail. Deputy Timothy Goodwin, Gibson's uncle, worked at the jail and knew Defendant through Gibson. In August of 2018, Defendant became irate because he believed the jail

8

administration was stealing his commissary money. Goodwin spoke with Defendant to calm him down. Goodwin explained the administration was redirecting deposits to Defendant's commissary account towards his outstanding debts. During their interaction, Defendant stated: "I killed that MF'r for less than this. I killed him for threatening to rape my sister."

Defendant exercised his right to a jury trial. Relevant here, Defendant requested jury instructions on defense of another and the lesser-included offense of involuntary manslaughter. Defendant's requested involuntary manslaughter instruction raised the theory of imperfect defense of another:

> To find the defendant guilty of this crime, you must be convinced that the government has proved beyond a reasonable doubt:
>
> First: the defendant caused the death of the victim named in the indictment;
>
> Second: the victim was killed while the defendant was committing a lawful act, *including defense of another, in an unlawful manner*, or without due caution and circumspection, which act might produce death;
>
> Third: the killing took place within Indian Country;
>
> Fourth: that Mr. Brown is an Indian.

R. Vol. I at 239 (emphasis added).

Before the end of the trial, the district court held a charging conference and presented its proposed jury instructions to the parties. During the conference, the court explained, sua sponte, that it would exclude Defendant's requested defense of another instruction because Defendant failed to show his belief that deadly force was necessary was reasonable:

9

Okay. So I've also considered including . . . [a] defense of another instruction. The defendant has not presented any evidence of . . . defense of another. The only allusion to this is the possible motive . . . brought through cross-examination. However, I don't think it's sufficient evidence for the jury to find that the defendant–not [that] the defendant didn't believe it, but the defendant didn't reasonably believe it, which is necessary as there's a reasonable person element in this self-defense claim.

And I do not believe that there's sufficient evidence for the jury to find that a reasonable person . . . would have believed that Damion Martin was going to kill or rape his sister, so I'm not going to include . . . [an] instruction o[n] defense of another.

R. Vol. I at 686–87.

In response, defense counsel urged the court to consider Watson, Goodwin and Turner's testimony relaying Defendant's statements that he believed Martin was going to kill or rape Watson. Next, the Government weighed in and remarked that, when viewed in Defendant's favor, "it's at best–it's an imperfect self-defense, which I think is defense of another, which I think is covered by the voluntary manslaughter instruction . . . ." The Government concluded that, "under a reasonable person standard[,] deadly force was not appropriate in this situation." The court ultimately instructed the jury on first-degree murder, second-degree murder, and voluntary manslaughter but excluded instructions on defense of another and involuntary manslaughter. Defendant did not object and the court offered no explanation for its omission of the involuntary manslaughter instruction. The jury unanimously convicted Defendant of first-degree murder. The district court subsequently granted Defendant's Rule 29 motion for acquittal as to first-degree murder based on its conclusion that the evidence did not support the jury's finding of premeditation. *See* Fed. R. Civ. P. 29.

The court therefore entered a judgment of guilty as to murder in the second degree against Defendant. The court sentenced Defendant to life imprisonment followed by a five-year term of supervised release.

## II.

Defendant argues the district court plainly erred by omitting his requested jury instruction on involuntary manslaughter premised upon the theory of imperfect defense of another. Defendant reasons there existed sufficient evidence to entitle him to the instruction.

Defendant tendered jury instructions on defense of another and involuntary manslaughter. Critically, Defendant's requested involuntary manslaughter instruction incorporated the theory of imperfect defense of another. But because Defendant failed to object when the district court omitted the instruction from its proposed jury instructions, we review for plain error. *United States v. Hicks*, 116 F.4th 1109, 1114 (10th Cir. 2024). To obtain reversal, Defendant must show: "(1) error, (2) that is plain, (3) which affects the party's substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quoting *United States v. Venjohn*, 104 F.4th 179, 183 (10th Cir. 2024)). "An error is plain when it is 'clear or obvious' that it is contrary to current Supreme Court or Tenth Circuit law." *Id*. (quoting *United States v. Koch*, 978 F.3d 719, 726 (10th Cir. 2020)).

The parties' dispute is narrowly focused on whether the evidence warranted the imperfect defense of another portion of Defendant's requested involuntary manslaughter instruction. It is well settled that "[a] defendant is entitled to an

11

instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).  In assessing whether sufficient evidence exists, "we accept the testimony most favorable to the defendant."  *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014).  The defendant's burden of production is "not onerous," and may be satisfied even where the evidence is "contradictory and not overwhelming."  *Id*. at 568 (citation omitted).  This framework serves to ensure the jury is appropriately equipped to resolve the underlying factual questions raised by the evidence at trial.  *Id*.

One such recognized defense is imperfect defense of another.  Defense of another contains the same elements as self-defense, the only difference being whether a defendant uses force to protect another person or himself.  Tenth Cir. Crim. Pattern Jury Instruction No. 1.28 (2021).  There are two types of defense of another claims: perfect and imperfect.  *Britt*, 79 F.4th at 1286.  Perfect defense of another occurs when the defendant *reasonably* believes another person is in imminent danger of death or great bodily harm, and in-kind force is necessary to prevent death or great bodily harm to that person.  *Toledo*, 739 F.3d at 567; *accord* Tenth Cir. Crim. Pattern Jury Instruction No. 1.28 (2021).  Perfect defense of another is a complete defense entitling the defendant to acquittal.  *Britt*, 79 F.4th at 1286 (citing *United States v. Craine*, 995 F.3d 1139, 1156 (10th Cir. 2021)).  Imperfect defense of another, by contrast, occurs when the defendant subjectively believes deadly force is necessary to prevent death or great bodily harm to another, but his belief is objectively *unreasonable*.  *Id*.  Imperfect

12

defense of another is a mitigation defense; if a jury finds it applies, the defendant is guilty of involuntary manslaughter, rather than murder. *Id*. This is because imperfect defense of another negates first-degree murder's malice element. *Id*. at 1287 n.2.

Our precedent on imperfect self-defense is instructive. In *United States v. Britt*, 79 F.4th 1280, 1293 (10th Cir. 2023), we held the district court committed reversible error by failing to instruct the jury on imperfect self-defense. In that case, the defendant, Britt, killed his father, Gary, with a katana sword following an argument. *Id*. at 1285. Gary had asked Britt to house sit while he was away with his wife on a weekend trip. *Id*. at 1283. He returned home to find an intoxicated Britt outside the house wearing only his underwear. *Id*. at 1284. The inside of the house was "destroyed." *Id*. Britt and Gary began to argue about the state of the house. *Id*. Britt testified as to what happened next, though his account was partially contradicted by other evidence in the record. *Id*. Britt alleged Gary "grabbed him around his torso and pinned him against the dresser" and said, "he was going to show [Britt] what a bitch was." *Id*. Britt was able to pull away from Gary but testified he "knew" Gary was coming back at him. *Id*. at 1291. Britt testified he then swung the katana twice at Gary and fled the room. *Id*. Britt also testified Gary had threatened him many times in the past. *Id*. Gary died from complications related to seven sharp-force wounds, including a nearly severed arm. *Id*. at 1285. In the 911 call that recorded some of the incident, Britt stated, "Get the fuck out of here, I'll do it" and "I'll cut you," before what sounded like swinging a katana. *Id*.

13

We held Britt presented sufficient evidence to warrant an imperfect self-defense instruction and the district court abused its discretion by excluding the instruction. *Id*. at 1291–92. We reasoned that, despite contrary evidence, we were obligated to give "full credence to Britt's testimony" and accept all other trial testimony "in the light most favorable to him." *Id*. at 1291. We also explained that Britt "was entitled to have the jury decide whether he subjectively believed that he faced an imminent risk of death or great bodily harm . . . and, if he did, whether such belief was objectively reasonable (self-defense) or unreasonable (imperfect self-defense)." *Id*. at 1292. In sum, *Britt* established it is error for a district court to refuse to instruct on imperfect self-defense when the defendant presents sufficient evidence that he subjectively believed he faced an imminent risk of death or great bodily harm. *Id*. at 1292–94. This holding applies with equal force to defense of another. *See* Tenth Cir. Crim. Pattern Jury Instruction No. 1.28 (2021) (using "self-defense" and "defense of another" interchangeably).

*Britt* requires us to hold the district court plainly erred by omitting Defendant's requested involuntary manslaughter instruction. Firstly, although Defendant did not explicitly invoke the words "imperfect defense of another," the record shows he adequately requested an instruction on that theory of defense. Defendant's requested involuntary manslaughter instruction specified that Defendant would be guilty of involuntary manslaughter if the jury found he "was committing a lawful act, including defense of another, in an unlawful manner . . . ." Defendant's language accurately, albeit less precisely, described imperfect defense of another, which is defense of

14

another conducted in a criminally negligent manner. *Craine*, 995 F.3d at 1156. If that weren't enough, the Government explicitly identified the issue of imperfect defense of another at the charging conference. Government counsel characterized Defendant's request for a defense of another instruction as "imperfect self-defense, which I think is defense of another . . . ." Additionally, Defendant went a step further than Britt by presenting the court with the appropriate lesser-included offense instruction that corresponds to imperfect defense of another.[3] Accordingly, the district court was not unaware that Defendant raised imperfect defense of another as a defense theory.

Secondly, the evidence at trial was plainly sufficient to warrant an imperfect defense of another instruction. Although Defendant himself did not testify, four separate witnesses relayed Defendant's statements that he subjectively believed Martin was going to kill or rape Watson.[4] We are obligated to accept their testimony. *Toledo*, 739 F.3d at 567. First, Watson herself testified that she asked Defendant why he stabbed Martin immediately after he did it. Defendant answered, "He was going to kill you, Lacie." Second, George Turner testified that, the next day, he overheard Defendant telling Mike Harris somebody "was going to rape his sister" and "wanted to

---

[3] Although the parties do not raise the issue, the instant case is thus distinguishable from our precedent in *Sago*, where the defendant requested a legally erroneous imperfect self-defense instruction *and* failed to request a lesser-included involuntary manslaughter instruction. *See Untied States v. Sago*, 74 F.4th 1152, 1160–63 (10th Cir. 2023) (stating "it would be intolerable to instruct a jury that a mitigation affirmative defense (such as imperfect self-defense) would establish innocence of the charged offense while failing to instruct the jury that the mitigating circumstances only reduce culpability to that of a lesser-included offense").

[4] The Government does not challenge that rape constitutes "great bodily injury."

15

rape his sister and suck on her titties." Third, at some point after the stabbing, but before Defendant's arrest, Defendant told Leonda Gibson that Martin "had threatened to rape Lacie." Fourth, while Defendant was in pretrial custody, he directly told Sheriff's Deputy Timothy Goodwin that he "killed that MF'r for less than this. I killed him for threatening to rape my sister."

Other evidence in the record bolstered, rather than contradicted, Defendant's theory, making this case even stronger than *Britt*. Gibson testified she saw Defendant and Martin "tweaking" the day before and the day of Martin's death. Alexis Perkins testified she saw Defendant and Martin smoking methamphetamine in the evening, just a few hours before Martin's death. Perkins also overheard Martin rap, "I got yo' [sic] bitch. She's gonna [sic] make me rich," to which Defendant responded, "Who?" and "acted paranoid." A few hours later, Martin and Watson were in the bathroom alone together while Watson showered. Defendant overheard Watson tell Martin to "get the fuck out" of the bathroom, and Martin's response, "Goddamn, Lacie." When Defendant busted through the bathroom door seconds later, Martin was hugging Watson in the shower. Watson had wrapped the shower curtain around her to conceal her naked body. Defendant was unaware of their prior consensual relationship.

In conclusion, viewing the evidence in a light favorable to Defendant, a jury could have inferred Defendant was high on methamphetamine, overheard an argument between Martin and Watson in the locked bathroom, broke in, misinterpreted their consensual hug, and stabbed Martin to protect Watson from what he subjectively believed to be an attempted rape. This version of events aligns with Watson, Turner,

16

Gibson, and Goodwin's trial testimony relaying Defendant's purported subjective belief. Accordingly, Defendant was "entitled to have the jury decide whether he subjectively believed [Watson] faced an imminent risk of death or great bodily harm from [Martin]." *Britt*, 79 F.4th at 1292. The quantum of evidence supporting an imperfect defense instruction in this case was abundant and relatively uncontroverted—it is thereby more compelling than the evidence we deemed sufficient in *Britt*. The district court's omission of Defendant's requested involuntary manslaughter instruction was thus plainly erroneous.

We now turn to the third prong of the plain-error analysis: whether the court's instructional error affected Defendant's substantial rights. "To demonstrate the error affected his substantial rights, Defendant must 'show a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *United States v. Samora*, 954 F.3d 1286, 1293 (10th Cir. 2020) (quoting *United States v. Benford*, 875 F.3d 1007, 1017 (10th Cir. 2017)). A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* (quotation omitted). In the jury instruction context, an error "affects substantial rights if it 'concerns a principal element of the defense or an element of the crime.'" *United States v. Piette*, 45 F.4th 1142, 1162 (10th Cir. 2022) (quoting *United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998)). Defendant has made the requisite showing here. The omitted involuntary manslaughter instruction raised a defense that negated malice, a principal element of first-degree murder. *Britt*, 79 F.3d at 1286–87. Furthermore, as the district court put it, "[t]here's almost zero evidence in this case as to any sort of motive. I mean, there's

17

some statements elicited on cross-examination but there's really hardly anything." Those statements on cross-examination constituted four witnesses' testimony repeating Defendant's assertion that he killed Martin *without malice* because he believed Martin was going to kill or rape Watson. Given the strength of evidence supporting the defense and relative dearth of evidence proving malice, we conclude the district court's omission affected Defendant's substantial rights.[5]

Lastly, turning to the fourth prong of the plain-error analysis, we consider whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. "'[A] district court's failure to instruct the jury on an essential element of the crime charged won't always satisfy the fourth prong of the plain-error test,' but we have before noted that reversal is appropriate when evidence supporting the omitted element is 'neither overwhelming nor uncontroverted.'" *Benford*, 875 F.3d at 1021 (quoting *United States v. Wolfname*, 835 F.3d 1214, 1223 (10th Cir. 2016)). The district court's omission prevented the jury from considering whether imperfect defense of another negated malice and reduced Defendant's culpability to involuntary manslaughter. *Craine*, 995 F.3d at 1156. As discussed, the evidence of malice was

---

[5] The Government argues Defendant's substantial rights were unaffected because the jury rejected his voluntary intoxication defense, and therefore would have rejected his imperfect defense of another instruction, too. More specifically, the Government extrapolates from the jury's first-degree murder verdict that the jury found Defendant was not high on methamphetamine when he stabbed Martin. This argument fails for two reasons. First, the voluntary intoxication instruction merely states the jury "may" consider Defendant's intoxication in assessing premeditation, not that intoxication necessarily negates premeditation. Second, a finding that Defendant was intoxicated is not necessary to find he acted in imperfect defense of another.

neither uncontroverted nor overwhelming.  We therefore conclude the fourth prong is satisfied.

*** 

For the foregoing reasons, we REVERSE Defendant's conviction and remand for a new trial before a properly instructed jury.[6]

---

[6] After reversing Defendant's murder conviction in this case, we need not address Defendant's challenge to his supervised release sentence here.  Defendant was, however, sentenced jointly in this case and Tenth Circuit Case No. 23-7040.  We address his identical sentencing challenge in an order and judgment filed in Case No. 23-7040.