**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

WILLIAM CLAYTON BROWN,

    Defendant - Appellant.

No. 23-7040
(D.C. No. 6:21-CR-00244-JWD-1)
(E.D. Okla.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, Chief Judge, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

Defendant William Clayton Brown suffocated his cellmate, Mark Lawhead, late one night in their shared two-person cell in the Oklahoma State Penitentiary. A jury convicted Defendant of premeditated first-degree murder. There was scant evidence as to how the confrontation started or unfolded. Consequently, to prove premeditation, the Government introduced evidence suggesting Defendant recently lost his status with the Indian Brotherhood (IBH) prison gang and theorized he killed Lawhead, a member of the rival Savage Boys gang, to regain favor with the IBH. Relying entirely on speculation, Defendant requested a self-defense jury instruction. The district court

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

refused, holding there was insufficient evidence Defendant reasonably believed he was in imminent danger of death or serious bodily harm. In fact, there is none. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm Defendant's conviction and remand for resentencing to correct Defendant's erroneous supervised release term.

## I.

Defendant and Mark Lawhead were inmates at the Oklahoma State Penitentiary. They were also members of rival prison "Security Threat Groups," otherwise known as prison gangs. Correctional staff "validated" Defendant as a member of the IBH prison gang in 2015 based on his own admission and his IBH tattoos. [R. at 1090]. Using the same criteria, correctional officers validated Lawhead as a member of the Savage Boys in 2018. [*Id*. at 1091]. The Savage Boys splintered from the IBH in 2014, creating a rift that culminated in a years-long "war" between the gangs. [*Id*. at 109394]. At the time Defendant killed Lawhead in October 2019, the gangs were at war and each had a "stab-on-sight" order against the other. [*Id*. at 1093]. Pursuant to that order, each gang expected its members to physically assault a rival gang member upon contact. [*Id*.].

Before his altercation with Lawhead, Defendant was involved in a physical altercation with his former cellmate, Israel Emmons. [*Id*. at 1098]. At the time, Defendant and Emmons were both IBH members. [*Id*.]. At trial, the Government sought to introduce evidence of Defendant's assault on Emmons because it resulted in Defendant losing "status" with the IBH—status he later sought to regain by killing rival gang member Lawhead. The district court excluded any evidence about the

2

specifics of the Emmons assault but allowed the Government to introduce several letters written by Defendant about the incident for the limited purpose of showing Defendant's motive to kill Lawhead. In one letter recovered from Defendant's cell, Defendant stated he "lost [his] spot" in the IBH "for what he did to [Emmons]." [*Id.*, Supp. App'x at 10]. In another letter, Defendant wrote "I'm not IBH no [sic] more . . . I'm Savage now," and referenced covering up his IBH tattoo. [*Id.* at 7]. Oklahoma Department of Corrections Intelligence Agent Mike Williams testified that he understood the letters to mean Defendant lost his spot in the IBH for assaulting Emmons. [R. at 1098].

After the Emmons incident, and several weeks before Defendant killed Lawhead, Defendant and Lawhead submitted separate requests to the correctional staff to reassign them to a two-person cell together. [*Id.* at 709]. The Unit Manager, Officer Sandra Hass, received the request and checked the department's computer system to ensure there were no conflicts that would prevent them from living together. [*Id.* at 712]. Her search revealed no conflicts.[1] [*Id.*]. Officer Hass then conducted separate interviews with each inmate. [*Id.*] They both indicated no conflicts and expressed a desire to move in together. [*Id.*]. Unaware that Defendant and Lawhead were members of rival gangs, Officer Hass approved their requests. [*Id.* at 713].

---

[1] Officer Hass testified that she was aware Defendant had formerly been an IBH member but understood him to be "out" of the gang as of early October. [R. at 716]. Officer Hass also stated she was unaware and had no records indicating Lawhead was a validated Savage Boys member. [*Id.*].

Shortly after the two were moved into their shared two-person cell, Defendant strangled Lawhead to death. Corporal Bain and Sergeant Benefield were on duty in Defendant's cell block that evening. [*Id*. at 566]. They were responsible for conducting inmate counts on the hour and inmate checks at half past each hour.[2] [*Id*. at 56465]. During the 10:00 p.m. count, Bain observed both Defendant and Lawhead in their cell, apparently asleep in their respective bunks. [*Id*. at 575]. As Bain approached Defendant's cell during the 10:30 p.m. check, however, Defendant was awake, and all the cell's lights were on. Defendant flagged Bain down and told him Lawhead "overdosed" and "he woke up to it." [*Id*. at 574]. Bain looked in the cell and observed Lawhead's body laying underneath the bottom bunk with a bag over his head. [*Id*.]. Bain cuffed Defendant through the cell's food passage and called for backup. [*Id*. at 576]. Once removed from the cell, Bain observed Defendant had blood on his shoes and on both pant legs from the knees down. [*Id*. at 577]. Bain transported Defendant to the infirmary where he refused medical treatment. [*Id*. at 578].

While Bain attended to Defendant elsewhere, OSP Registered Nurse Christopher Stokes responded to the cell for a trauma call. When Stokes arrived, he checked Lawhead's vital signs and noted he was cold to the touch. [*Id*. at 592]. Stokes found no sign of respiratory movement or pulse. [*Id*.]. Stokes phoned the infirmary's on-call provider and explained his findings. The provider called Lawhead's time of

---

[2] Corporal Bain testified that officers in Defendant's cell unit performed a safety "check" every thirty minutes. [R. at 141]. They performed an inmate "count" once every hour. An inmate count is a more in depth check in which the officer verifies the inmates are alive and records the results.

death at 10:48 p.m. [*Id.* at 593]. During a subsequent autopsy, Medical Examiner Dr. Jeremy Shelton concluded Lawhead died by homicide from asphyxia and blunt force injuries. [*Id.* at 830, 832]. Dr. Shelton found two plastic bags over Lawhead's head, both pushed back into Lawhead's mouth by the handle of a toothbrush. [*Id.* at 812]. Also present was a laundry bag string looped around Lawhead's neck. [*Id.*]. Dr. Shelton further documented at least twelve blunt force injuries on Lawhead's head, neck, abdomen, and elbow. [*Id.* at 814–15]. He noted no significant injuries on Lawhead's hands or knuckles that would suggest Lawhead was in an offensive posture during the altercation. [*Id.* at 816–17]. A toxicology report showed Lawhead had .39 micrograms per milliliter concentration of methamphetamine in his blood, consistent with a mid-to-low-end dosage. [*Id.* at 829–30].

At trial, the Government theorized Defendant killed rival Savage Boy Lawhead to regain favor with the IBH after he lost his status over his altercation with Emmons. Central to this theory was one particular letter that Sgt. Micah Hamel discovered while reviewing inmates' outgoing mail a day or two after Lawhead's death. [*Id.* at 730–33]. In it, Defendant wrote to his girlfriend that he had "been in here trying to make shit wright [sic] w/ my Family Bros . . . I' [sic] been putting in hell of work for [Emmons] IBH I owe that Lil Bro my life." [*Id.* at 755.]. Later in the letter, Defendant wrote, "I smoked a Savage Boy Last night on God I' [sic] did!!" [*Id.* at 756]. Defendant continued: "That's da [sic] shit I' [sic] was talking about I'm putting in work doing dirt after dirt . . . I' [sic] realy [sic] lost my spot & Respect went down some 4 [sic] Real." [*Id.* at 757]. Department of Intelligence Agent Mike Williams testified he

5

understood the letter to mean Defendant was attempting to get his respect and spot back in the IBH by doing illegal acts for the gang. [*Id*. at 757].

Defendant's counsel, on the other hand, argued Defendant killed Lawhead in self-defense. To that end, he proposed a self-defense jury instruction, and objected when the district court chose not to include the instruction amongst the court's proposed instructions. Defendant's counsel conceded the evidence supporting a self-defense instruction "is not strong," but nevertheless pointed to two pieces of testimony: Investigator Hunter's testimony that Defendant stated his jaw was broken; and Dr. Shelton's testimony that he could not rule out the possibility of a struggle within the cell. [*Id*. at 859]. Defendant did not testify. Citing this Court's decision in *United States v. Toledo,* 739 F.3d 562, 567 (10th Cir. 2014), the district court held the evidence at trial was insufficient to show Defendant had a reasonable belief that he was in imminent danger of death or serious bodily harm, thus he was not entitled to a self-defense instruction. The district court overruled Defendant's objection, gave no self-defense instruction, and the jury unanimously convicted Defendant of first-degree murder. [R. at 899].

The events underlying the case at bar unfolded while Defendant was in pretrial custody in a separate case for allegedly murdering Damion Martin. Defendant was eventually convicted of second-degree murder in the Martin trial and first-degree murder in the instant case. [*Id*. at 90708]. The district court held a joint sentencing hearing for Defendant's two murder convictions. The court imposed a term of life imprisonment for each conviction, to run consecutively. [*Id*. at 913]. On top of that,

the court imposed a five-year term of supervised release in each case, also to run consecutively.

Defendant now appeals, asserting the district court erred by (1) refusing to instruct the jury on self-defense, and (2) imposing consecutive terms of supervised release. We agree with Defendant's second argument only. As such, we affirm Defendant's conviction and remand to the district court for resentencing with instruction to impose concurrent terms of supervised release.

## II.

We turn first to Defendant's challenge to his first-degree murder conviction. Defendant argues the district court erred in holding there was insufficient evidence to support an instruction on his self-defense theory. We disagree.

We review the district court's refusal to give a requested self-defense instruction for abuse of discretion. *United States v. Britt*, 79 F.4th 1280, 1286 (10th Cir. 2023). "In a criminal trial, a defendant is entitled to an instruction on any recognized defense for which sufficient evidence exists for a reasonable jury to find in his favor." *United States v. Hicks*, 116 F.4th 1109, 1114 (10th Cir. 2024). In determining the sufficiency of the evidence, "we accept the testimony most favorable to the defendant." *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014)). A "defendant need only produce enough evidence to persuade the jury to have a reasonable doubt about whether the defendant acted in self-defense." *United States v. Barrett*, 797 F.3d 1207, 1218 (10th Cir. 2015). "A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response."

*Toledo*, 739 F.3d at 567; *cf.* 10th Cir. Crim. Pattern Jury Instructions No. 1.28 (2021). It follows that a defendant is entitled to a self-defense instruction if he produces sufficient evidence such that a jury could find the defendant reasonably believed he was in imminent danger of death or great bodily harm. *Barrett*, 797 F.3d at 1218.

Defendant argues the trial record, when viewed in his favor, supports the inference that Lawhead ambushed him without provocation, prompting Defendant to respond with in-kind force against Lawhead. Defendant starts from the premise that he regularly slept in the top bunk based upon Agent Dale Hunter's testimony to that effect. Defendant then relies upon Corporal Bain's testimony that both inmates appeared asleep during the 10:00 p.m. check to infer he must have been asleep when the assault began. Finally, Defendant cites Dr. Shelton's testimony that it is theoretically possible some of Lawhead's injuries could be explained by a fall onto a metal stool that was bolted to the ground below the bunk. From this testimony, Defendant concludes it is reasonable for a jury to infer Lawhead attacked Defendant while he was sleeping on the top bunk, prompting Defendant to push Lawhead onto the stool in self-defense. As to motive, Defendant theorizes Lawhead initiated the attack "as a manifestation of his severe mental illness, medication noncompliance, and/or methamphetamine intoxication." [Applt's Br. at 2728]. He points to a handful of Lawhead's untaken prescription medications recovered from their cell and the methamphetamine contained in Lawhead's blood post-mortem. [*Id.*].

Defendant's theory does not accord with the evidence. Firstly, Corporal Bain's testimony that Defendant appeared to be asleep during the 10:00 p.m. check at best

8

suggests he was asleep at that moment—it does not support the further inference that he was asleep when the altercation began.[3]  The record contains no evidence—be it security camera footage, eyewitness testimony, or otherwise—specifying when, during the thirty-minute window between checks, the fight started.  It follows that there is no evidence Defendant was asleep at that time.  Nor is there any evidence Lawhead struck first.  To the contrary, the record suggests the opposite is true.  Nurse Stokes testified Defendant had no visible injuries.[4]  [R. at 594].  When asked, Defendant did not report any pain or injuries and refused medical care.  [*Id*.].  Dr. Shelton noted no injuries on the backside of Lawhead's hands or knuckles.  [*Id*. at 633].  Furthermore, Defendant's theory that Lawhead fell onto the stool is without support.  Investigators discovered blood streaks on the floor below the stool, but not on it.  [*Id*. at 62324].  Dr. Shelton testified the theory was "unlikely" and that the fall "could cause some but not all of the [rib] fractures."  [*Id*. at 842].  In sum, Defendant's theory of self-defense is not just speculative, it is speculation largely contradicted by evidence in the record.  The

---

[3] Dr. Shelton testified that homicide by asphyxia typically takes between two and five minutes.  [R. at 801].

[4] Agent Dale Hunter testified that he "thought" Defendant stated his jaw was broken.  [R. at 650].  There is no evidence in the record corroborating that Defendant made that statement or its truth.  Even assuming Defendant's jaw was broken, there is no evidence indicating Lawhead inflicted the injury.

district court therefore did not err in denying Defendant's request for a self-defense jury instruction.

**III.**

Turning to Defendant's sentencing challenge, the district court imposed a five-year supervised release term for Defendant's instant first-degree murder conviction to run consecutively to the five-year supervised release term imposed for his separate, second-degree murder conviction. Defendant argues 18 U.S.C. § 3624(e) requires his supervised release terms to run concurrently. The Government concedes error. We agree.

We review de novo the district court's imposition of consecutive terms of supervised release.[5] *United States v. Bailey*, 76 F.3d 320, 323 (10th Cir. 1996). "Where a federal statute mandates that separate terms of supervised release run consecutively, we have held that a trial court properly may stack consecutive terms of supervised release for multiple convictions." *Id*. When there is no such statutory mandate, however, 18 U.S.C. § 3624(e) governs:

> The term of supervised release commences on the day the person is released from imprisonment and runs *concurrently* with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject . . . .

---

[5] Defendant argues this issue under the plain error standard in his briefing. Even applying the plain error standard, however, the question of whether a federal statute mandates concurrent terms of supervised release is one of law that we review de novo. *See Bailey*, 76 F.3d at 323 (noting that "we review the district court's imposition of consecutive terms of supervised release de novo"); *see also United States v. Visinaiz*, 428 F.3d 1300, 1308 (10th Cir. 2005) ("When no objection to a jury instruction was made at trial, the adequacy of the instruction is reviewed de novo for plain error.").

(emphasis added).  The court sentenced Defendant on two counts of murder in Indian Country in violation of 18 U.S.C. § 1111.  That statute does not mandate that supervised release terms run consecutively.  As such, § 3624(e) controls, so the district court erred in imposing consecutive supervised release terms.

***

We AFFIRM Defendant's first-degree murder conviction.  Because the district court erred in imposing consecutive supervised release terms, we VACATE Defendant's sentence and remand for resentencing in a manner consistent with this opinion.

                                        Entered for the Court


                                        Bobby R. Baldock
                                        Circuit Judge